**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ALAN MERRIFIELD, et al.,<br><br>    **Plaintiff,**<br><br>    v.<br><br>BILL LOCKYER, ATTORNEY GENERAL<br>OF THE STATE OF CALIFORNIA, et al.,<br><br>    **Defendants.** | No. C 04-0498 MMC (WWS)<br><br>**Tentative Ruling**<br><br>**MEMORANDUM OPINION<br>AND ORDER** |

Plaintiffs Alan Merrifield, owner and operator of a pest control business, and the California Nuisance Wildlife Control Operators' Association (CNWCOA), a trade association, have moved for summary judgment on their claims under 42 U.S.C. § 1983 against defendants Kelli Okuma, Registrar and Executive Officer of the California Structural Pest Control Board (SPCB), and Jean Melton, Bill Morris, Michael Roth, Mustapha Sesay, Chris Arzate, and Kenneth L. Trongo, members of the SPCB, sued in their official capacities. Plaintiffs contend that no reasonable trier of fact could fail to find that defendants' interpretation and enforcement of a state licensing scheme for structural pest controllers violates plaintiffs' rights under the Due Process, Equal Protection, and Privileges & Immunities Clauses of the Fourteenth Amendment of the United States Constitution. Defendants have cross-moved for summary judgment on all

of plaintiffs' claims, arguing that the claims are nonjusticiable on standing and ripeness grounds, that the claims cannot succeed on their merits, and that this Court should abstain from deciding a question of state regulatory law. For the reasons presented below, the Court grants defendants' motion and denies plaintiffs' motion for summary judgment.

## BACKGROUND

### I. CALIFORNIA'S STRUCTURAL PEST CONTROL LICENSING SCHEME

Since 1941, the California Business & Professions Code has provided that a Structural Pest Control Board within the state's Department of Consumer Affairs will regulate those engaged in the business of "structural pest control."[1] CAL. BUS. & PROF. CODE § 8520. The Code makes it unlawful for "any individual to engage or offer to engage in the business or practice of structural pest control . . . unless he or she is licensed" in conformity with state law and the SPCB's requirements. *Id.* § 8550(a). The Code establishes a licensing scheme with three "branches." *Id.* § 8560(a). Branch 1 licenses are for those engaged in fumigation; Branch 2 licenses are for those engaged in "[g]eneral pest" control, defined as "[t]he practice relating to the control of household pests, excluding fumigation with poisonous or lethal gases"; and Branch 3 licenses are for those engaged in termite control. *Id.*

As noted, California has regulated structural pest control providers since 1941. Under the statutory scheme, persons providing general nonpesticide structural pest control services, like plaintiffs (along with those using pesticides), have been continuously regulated and required to

---

[1] The SPCB's "primary mission," according to the Code, is "consumer protection." CAL. BUS. & PROF. CODE § 8520. The Code defines "structural pest control" as including

> identification of infestations or infections; the making of an inspection or inspections for the purpose of identifying or attempting to identify infestations or infections of household or other structures by such pests or organisms; the making of inspection reports, recommendations, estimates, and bids, whether oral or written, with respect to such infestations or infections; and the making of contracts, or the submitting of bids for, or the performance of any work including the making of structural repairs or replacements, or the use of insecticides, pesticides, rodenticides, fumigants, or allied chemicals or substances, or mechanical devices for the purpose of eliminating, exterminating, controlling, or preventing infestations or infections of such pests, or organisms.

*Id.* § 8505. It defines "structural pests" as "household pests and wood destroying pests or organisms, or such other pests which may invade households or other structures, including railroad cars, ships, docks, trucks, airplanes, or the contents thereof." *Id.*

obtain Branch 2 licenses. In 1995, the California legislature amended the Code to include an exemption for

> [p]ersons engaged in the live capture and removal or exclusion of vertebrate pests, bees, or wasps from a structure without the use of pesticides. . . . "Vertebrate pests" include, but are not limited to, bats, raccoons, skunks, and squirrels, but do not include mice, rats, or pigeons.

*Id.* § 8555(g). Because they are exempted, such persons may engage in "structural pest control" without a license. *Id.* § 8555. But because the exemption excludes mice, rats, and pigeons from its definition of "vertebrate pests," individuals remained subject to the licensure requirement if they "engage[] in the live capture and removal or exclusion of" mice, rats, or pigeons. *Id.* § 8555(g). The SPCB, charged with administration of the Code's licensing scheme, interprets this provision as requiring that individuals engaged in nonpesticide pest control must obtain a Branch 2 license if their activities might affect or involve the exclusion of mice, rats, or pigeons. *See, e.g.*, Ex. A to Decl. of Timothy Sandefur, at 37:4-8, 24:11-19.

To obtain a Branch 2 license, an individual must present proof that he or she has had at least two years of "actual experience . . . or the equivalent"[2] working in "the particular branch" for which a license is desired. CAL. BUS. & PROF. CODE § 8562(b). Since 1993, each applicant has also been required to provide proof of a year of experience as a licensed Branch 2 "field representative." *Id.* § 8562(f). Finally, the applicant must pass the SPCB-created Branch 2 exam with a score of 70% or better. *Id.* §§ 8560(a), (f).

As noted, the Code makes it unlawful for an individual to engage in structural pest control without a license. CAL. BUS. & PROF. CODE § 8550. The Code makes violation of this requirement a misdemeanor punishable by up to $1000 and six months in jail for each violation. *Id.* § 8553. Under the Code it is also a misdemeanor "for any person to submit a bid to a public agency . . . without having a license therefor." *Id.* § 7028.15(a).

Materials supplied by plaintiffs indicate that the SPCB has authority to and does in fact enforce these licensing requirements. *See* Pls.' Mot. at 5-6, 9. The SPCB does not dispute that

---

[2] The Code defines one year of experience as equaling "1,600 hours of actual experience in the field." CAL. BUS. & PROF. CODE § 8562(b).

3

it has fined one business for bidding on a public contract without a Branch 2 license, *id.* at 5, and issued a cease-and-desist order to another business without a Branch 2 license engaged in installing anti-pigeon netting on residences, *id.* at 6. Plaintiff Merrifield submitted materials dating from 2001 reflecting correspondence with California state officials confirming that without a Branch 2 license he would not be permitted to bid on a contract for pigeonproofing a state government building in San Francisco. Exs. C-F to Decl. of Alan J. Merrifield. Merrifield also submitted materials from 2003 indicating rejection of his bid for a contract to birdproof the Trans Bay Terminal in San Francisco, in part on the basis of Merrifield's lack of a Branch 2 license. Exs. G-K to Merrifield Decl. Finally, Merrifield submitted a copy of a "Warning Letter" that the SPCB sent him on February 21, 1997. Ex. M to Merrifield Decl. The letter contains the following language:

> Existing law generally requires a person or entity engaged in the practice of structural pest control to be licensed by the Structural Pest Control Board. . . .
>
> It has come to the Board's attention that you do not posses [sic] the proper Branch II (General Pest Control) License or Company Registration Certificate issued by the Board. It is also apparent that you are advertising and conducting Rodent Proofing (rats, mice, etc.) activities.
>
> If you or your firm is conducting any pest control activity or advertisement which requires a Branch II License or Company Registration Certificate, you are ordered to cease and desist all activity unless properly licensed or are [sic] in compliance with Section 8555(g) Business and Professions Code.
>
> This notice will be your only warning that any firm or person which violates the provisions of the Structural Pest Control Act will be investigated and appropriate legal action will be initiated through the District Attorney's Office. Compliance with these requirements . . . shall be mandatory by March 31, 1997.

*Id.*

## II.   PROCEDURAL BACKGROUND

Plaintiff Merrifield owns and operates Urban Wildlife Management, Inc. (UWM), a company engaged in "animal damage prevention and bird control" (ADP&BC). UWM is also a plaintiff in this action. UWM's business consists of "installing [devices such as] screens, spikes, one-way doors, or even plastic owls on buildings to deter wildlife from entering a structure, or to get the animal to leave permanently." Pls.' Mot. at 3; *see also* Merrifield Decl. ¶¶ 10-11. UWM

4

sometimes also installs electronically operated devices to achieve these goals. Pls.' Mot. at 3. UWM does not use pesticides to control animals or birds. *Id.* Plaintiff CNWCOA is a trade group of businesses that, like UWM, are "engaged in the nonpesticide removal or exclusion of vertebrate pests." *Id.* at 6. Plaintiffs assert that "many of its members do not have Branch 2 licenses." *Id.*

Plaintiffs initiated this action in February 2004.[3] On May 10, 2004, plaintiffs filed a First Amended Complaint (FAC), naming as defendants in their official capacities Bill Lockyer, Attorney General of the State of California; Jean Melton, Bill Morris, Michael Roth, Mustapha Sesay, Karl Thurmond, and Kenneth L. Trongo, members of the SPCB; and Kelli Okuma, Registrar of the SPCB. Dkt. No. 28. Plaintiffs alleged that the structural pest-control licensing scheme, as interpreted and enforced by defendants, violated plaintiffs' rights under the Due Process, Equal Protection, and Privileges and Immunities Clauses of the Fourteenth Amendment and requested declaratory and injunctive relief. Lockyer and the SPCB defendants moved separately to dismiss the FAC. Dkt. Nos. 44-46.

By Order filed July 16, 2004, the Court (Chesney, J.) granted Lockyer's motion but denied the motion of the SPCB defendants. As to Lockyer, the Court held that because plaintiffs had not "alleged that Lockyer ha[d] filed or threatened to file an action against any plaintiff," they had failed to allege a case or controversy against him. Order Den. SPCB Defs.' Mot. to Dismiss, *Merrifield v. Schwarzenegger*, No. 04-0498 MMC, at 6 (N.D. Cal. July 16, 2004) (Dkt. No. 60).[4] On the merits, the Court identified the central issue in the case as the question whether

---

[3] In their original and amended complaints, plaintiffs named as defendants a number of additional state officials, including Arnold Schwarzenegger, Governor of the State of California, and Valerie Brown, California Assemblywoman. Plaintiff sued all defendants in their individual capacities. Dkt. Nos. 1, 5. Two groups of defendants filed separately to dismiss the complaint, on the grounds that (1) plaintiffs failed to allege a justiciable case or controversy, and (2) plaintiffs failed to state a claim on which relief could be granted. Dkt. Nos. 6, 7. By order filed April 21, 2004, the Court (Chesney, J.) granted the motions to dismiss with leave to amend. Dkt. No. 21.

[4] In reaching this conclusion, the Court rejected defendants' argument that plaintiffs' claimed injuries could be redressed only by the California legislature. *See* Order of July 16, 2004, at 6-7. Defendants raise this argument again in their cross-motion for summary judgment. *See* Defs' Mot. at 11-12. Because plaintiffs are challenging the SPCB's interpretation and enforcement of the structural pest licensing scheme and requirements, the Court again rejects defendants' contention that the SPCB

(continued...)

5

§ 8555(g) was rationally related to a legitimate government purpose. *See* Order of July 16, 2004, at 7. The Court concluded that the "issue of whether the Legislature lacked a rational basis to require nonpesticide ADP&BC providers to obtain a Branch 2 License [wa]s premature." *Id.* at 8. On May 6, 2005, defendants filed a first motion for summary judgment, accompanied by supporting exhibits and a forty-page Memorandum of Points and Authorities. Dkt. No. 85. After issuing an order to show cause why the motion should not be stricken for failure to comply with Civil Local Rule 7-2(b) (imposing 25-page limit on motions), the Court ordered the motion stricken. Dkt. Nos. 107, 113. On May 5, 2005, plaintiffs filed their own motion for summary judgment, with supporting exhibits. Dkt. Nos. 86-89, 91-99, 101-06. Defendants refiled a motion for summary judgment on May 20, 2005. Dkt. No. 114. By Order dated June 2, 2005, the matter was referred to Judge William W Schwarzer. Dkt. No. 119. The parties' motions for summary judgment, with supporting materials, are now before the Court.[5]

## LEGAL STANDARD

Summary judgment is indicated when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323-34 (1986).

---

[4](...continued)
is not a proper defendant in this action.

[5]Plaintiffs have filed objections to evidence presented by defendants in support of their motion for summary judgment in the form of declarations. Dkt. No. 141; *see also* Dkt. Nos. 150, 153. As discussed further below, in assessing whether the challenged portion of the structural pest control licensing scheme has a rational basis, the Court need not consider evidence of the legislature's actual purpose in enacting the scheme. *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313 (1993). The issue of whether a rational basis exists for the statutory scheme is not one of fact, but is a purely legal question. Since the contentions contained in the challenged declarations are also in substance advanced as legal arguments elsewhere in defendants' papers, the Court need not consider those declarations in determining the rationality of the licensing scheme. The Court therefore declines to entertain plaintiffs' objections as moot.

6

**DISCUSSION**

Plaintiffs' motion for summary judgment focuses on the merits of their constitutional challenge to the SPCB's interpretation and enforcement of the structural pest licensing scheme. They contend that no reasonable trier of fact could fail to find that the current scheme and its enforcement lack a rational basis. Defendants counter with the argument that no rational trier of fact could fail to find a rational basis for the scheme as enforced, but they also challenge plaintiffs' ability to bring this suit and this Court's power to hear it. The following discussion considers these preliminary issues of justiciability before addressing the merits.

## I.  JUSTICIABILITY

Defendants argue that plaintiffs lack standing to challenge the statute, Defs.' Mot. at 7-10, and that their claims are not ripe, *id.* at 10.

### A.  *Standing*[6]

To avoid summary judgment on the standing issue, plaintiffs must show, through presentation of specific facts, that they satisfy the standing requirements of Article III. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). For purposes of deciding a motion for summary judgment, the court is to take the specific facts averred by plaintiffs as true. *See id.* at 561. In the Ninth Circuit, in a suit for declaratory or injunctive relief, a plaintiff's required showing as to standing has four elements: (1) plaintiffs must show that they "have suffered an injury-in-fact to a legally protected interest that is both concrete and particularized and actual or imminent, as opposed to conjectural or hypothetical"; (2) they must show "a causal connection between their injury and the conduct complained of"; (3) they must show that it is "likely—not merely speculative—that their injury will be redressed by a favorable decision"; and (4) they must

---

[6] Although the Court (Chesney, J.) previously addressed the question of plaintiffs' standing, *see* Order of July 16, 2004, at 4-7, the Court undertook this prior analysis in the context of a motion to dismiss. The Supreme Court has instructed that standing requirements become slightly more rigorous—requiring the plaintiff to present more specific averments—at the summary judgment stage. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) ("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice; . . . [i]n response to a summary judgment motion, however, the plaintiff can no longer rest on such mere allegations, but must set forth by affidavit or other evidence specific facts which for purposes of the summary judgment motion will be taken to be true.") (internal quotation marks and citations omitted). For this reason, the Court re-examines the question of plaintiffs' standing in the present Order.

7

"show a very significant possibility of future harm; it is insufficient for them to demonstrate only a past injury." *San Diego County Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1126 (9th Cir. 1996) (citing *Lujan*, 504 U.S. at 560-61; *Bras v. California PUC*, 59 F.3d 869, 873 (9th Cir. 1995)) (internal quotation marks omitted). The fourth of these factors is analyzed below together with the first.

### 1. Concrete and actual or imminent injury with very significant possibility of future occurrence

Plaintiffs contend that they are injured by the "reasonable likelihood that they will be prosecuted under an allegedly unconstitutional law." Pls.' Mot. at 4. They also contend that injury-in-fact results from rejection of their bids on projects by state agencies due to plaintiffs' lack of Branch 2 licenses.[7] *Id.* at 7. Defendants respond that plaintiffs have failed to show either actual enforcement of the licensing scheme against them or a concrete threat of such enforcement. Defs.' Mot. at 8. They contend that in the Ninth Circuit, a showing of actual injury through threatened prosecution requires plaintiffs to show "proof of some concrete plan to violate the law in question, a specific warning or threat of prosecution by the appropriate authorities, and/or a specific history of past prosecution and enforcement." Defs.' Mot. at 8 (citing *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) (en banc); *San Diego County Gun Rights Comm.*, 98 F.3d at 1126-28).

Merrifield and UWM have shown actual past injury in the form of the state's rejection of Merrifield's bid on a public contract on the basis of his lack of a Branch 2 license.[8] *See* Exs. C-I

---

[7] Plaintiffs also contend that the time and expense they would have to invest to obtain Branch 2 licenses would constitute injury-in-fact. Pls.' Opp'n at 7-8. However, Merrifield and UWM do not assert any concrete plan to obtain a Branch 2 license. *Cf. Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1140 (9th Cir. 2000) (en banc). This argument is also inconsistent with plaintiffs' argument regarding threatened prosecution; if plaintiffs were to invest in obtaining a license, they would not risk prosecution. Finally, the validity of the argument that the forced choice between obtaining a license and being prosecuted constitutes an injury-in-fact, *see* Pls.' Opp'n at 7-8, depends on a prior conclusion that both horns of that dilemma would constitute injuries-in-fact. This discussion therefore focuses on plaintiffs' threat-of-prosecution argument.

[8] Since Merrifield is a member of the CNWCOA, the association's standing is derivative of his. *San Diego County*, 98 F.3d at 1130-31 ("[A]ssociational plaintiffs have standing to sue on behalf of their members . . . if (a) their members would otherwise have standing to sue in their own right; (b) the

(continued...)

8

to Merrifield Decl.; Merrifield Decl. ¶¶ 20-28. As noted, however, the Ninth Circuit also requires a plaintiff in a suit for declaratory or injunctive relief to show "a very significant possibility of future harm." *San Diego County*, 98 F.3d at 1126. The Court must therefore turn to plaintiffs' showing of a likelihood of prosecution.

Defendants correctly cite the standards applicable to evaluation of a showing of threatened prosecution, stated by the Ninth Circuit in *Thomas v. Anchorage Equal Rights Commission*. 220 F.3d at 1139. In assessing whether plaintiffs have alleged justiciable injury on the basis of a threat of prosecution, a court is to consider whether plaintiffs have presented (1) allegations or a showing of "a 'concrete plan' to violate the law in question"; (2) allegations or a showing of "a specific warning or threat to initiate proceedings" from "the prosecuting authorities," and/or (3) allegations or a showing of "past prosecution or enforcement under the challenged statute." *Id.* Contrary to defendants' contentions, however, plaintiffs' showings meet these standards.

Merrifield and UWM have shown specific plans to violate the licensing scheme as interpreted by the SPCB. Merrifield has stated a concrete intention to advertise for sale and installation in California a birdproofing device that would function to exclude pigeons where installed. *See* Merrifield Decl. ¶¶ 8-9. This advertisement and installation would violate the terms of the "warning letter" Merrifield received from the SPCB, which ordered him to cease and desist from "any pest control activity or advertisement which requires a Branch II License." Ex. M to Merrifield Decl.; *see also* CAL. BUS. & PROF. CODE § 8550(a) (making it "unlawful for any individual to engage or offer to engage in the business or practice of structural pest control . . . unless he or she is licensed under this chapter"). The SPCB has made clear that it interprets the Branch 2 licensing requirements as applying to those whose work would affect mice, rats, or pigeons. *See* Ex. M to Merrifield Decl.; Decl. of Robert Van Gelder, ¶¶ 5-9; Exs. B & C to Van Gelder Decl. (reflecting citation issued to bird control business by SPCB for

---

[8](...continued)
interests that the organizations seek to protect are germane to their purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.") (citing *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)). This analysis therefore focuses only on the standing of Merrifield and UWM.

9

"advertising and performing bird control work" without Branch 2 license and payment of $1000 fine); Ex. I to Sandefur Decl. (cease-and-desist order issued by SCPB to Mike Gelder and Nation Wide Bird Control of Tracy, California). This indicates that plaintiffs have shown "more than a hypothetical intent to violate the law" as it is interpreted and enforced by the SPCB. *Thomas*, 220 F.3d at 1139.

Plaintiffs have also shown by admissible evidence the receipt by Merrifield of at least one specific threat of prosecution, *see* Ex. M to Merrifield Decl., and a history of enforcement of the Branch 2 licensing requirement against nonpesticide ADP&BC operators, *see* Van Gelder Decl., ¶¶ 5-9; Exs. B & C to Van Gelder Decl.; Ex. I to Sandefur Decl. Defendants have not asserted that their enforcement policies have changed in any way since these events. These showings are far more specific than the allegations presented in either *San Diego County*,[9] 98 F.3d at 1126-29, or *Thomas*,[10] 229 F. 3d 1139-41, the cases on which defendants rely for their argument that plaintiffs should be found to lack standing. The Court concludes that the plaintiffs' showings satisfy their burden of specifically averring, through "affidavit or other evidence," a very significant likelihood of future enforcement of the licensing scheme requirements in the challenged manner against them. *Lujan*, 504 U.S. at 561.

---

[9] In *San Diego County*, plaintiffs challenged the federal Crime Control Act (CCA), Pub. L. No. 103-322, 108 Stat. 1796 (1994). The Ninth Circuit, holding that the plaintiffs lacked standing, noted that they alleged only an intention "to engage in unspecified conduct prohibited by the CCA," *id.*, and did not "articulat[e] concrete plans to violate the" CCA, *id.* at 1127. The Ninth Circuit contrasted these with allegations held sufficient for standing in *Babbitt v. United Farm Workers National Union*, 442 U.S. 289 (1979); in *Babbitt*, the plaintiffs "alleged that they had previously engaged in and would continue to engage in acts regulated under the challenged regulation." 98 F.3d at 1127. The court also noted that the plaintiffs had not identified "even a general threat" of prosecution against them, much less the "specific warning of an intent to prosecute" that could suffice to show concrete, imminent injury. *Id.* Finally, the Ninth Circuit noted that the plaintiffs had not even alleged that the CCA was being enforced; they had not alleged "any past prosecutions under" the CCA. *Id.* at 1128.

[10] In *Thomas*, plaintiffs alleged that their religious beliefs forbade their renting apartments to unmarried couples, and that an Alaska law prohibiting housing discrimination based on marital status violated the Free Exercise Clause. 220 F.3d at 1137-38. The plaintiffs "claim[ed] that they had refused to rent to unmarried couples in the past and . . . intend[ed] to do so in the future," *id.* at 1137, but were unable to "identify any tenants turned away due to their marital status," and "no prospective tenant ha[d] ever complained to the state or municipal authorities," *id.* at 1140. The plaintiffs also could not show "even a single criminal prosecution" under the law, and only two instances of civil enforcement, both initiated by tenant-filed complaints. *Id.* The Ninth Circuit concluded that the plaintiffs did not "confront a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Id.* at 1141.

10

### 2. Causation and redressability

To meet the causation requirement for Article III standing, plaintiffs must show that their injury is or would be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (internal quotation marks, alterations, and citation omitted). To meet the redressability requirement, plaintiffs must show that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* (internal quotation marks and citation omitted).

Plaintiffs' showings meet these standards. The evidence of past prosecution supplied by plaintiffs indicates that the SPCB is the state entity enforcing the Branch 2 licensing requirement. *See* Exs. B & C to Van Gelder Decl.; Ex. I to Sandefur Decl.; Ex. M to Merrifield Decl. Thus, any injury from future prosecution would be the result of the SPCB's action, not "the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560. This satisfies the causation requirement. Plaintiffs have requested declaratory relief rendering the § 8555(g) licensing exemption applicable to them, and injunctive relief preventing defendants from enforcing the Branch 2 licensing requirement against nonpesticide ADP&BC operators. FAC at 17. This relief, if granted, would without question prevent the feared injury. *See Lujan*, 504 U.S. at 560. This satisfies the redressability requirement. The Court concludes that plaintiffs have shown that they have standing to challenge California's structural pest control licensing scheme, as created by Cal. Bus. & Prof. Code §§ 8550(a), 8560(a), and 8555(g) and as interpreted and enforced by the SPCB.

*B.  Ripeness*

Defendants also argue briefly that plaintiffs' claims "are insufficiently ripe for adjudication." Defs.' Mot. at 10. Specifically, they assert that plaintiffs have not presented "sufficient evidence or proof that the provision has been or will be enforced, against them or anyone else." *Id.* This characterization of plaintiffs' claims is inaccurate. Plaintiffs are not bringing a "pre-enforcement challenge," as defendants contend. *Id.* at 8; *cf. San Diego County*, 98 F.3d at 1132. Rather, as already noted, plaintiffs have shown by means of documentation and

specific averments that the SPCB interprets and enforces the structural pest licensing requirement in the challenged manner. *See* Exs. B & C to Van Gelder Decl.; Ex. I to Sandefur Decl.; Exs. C-M to Merrifield Decl. Thus, there is no question that this "litigation present[s] the court with the concrete facts that are necessary to an informed decision." *Buckley v. Valeo*, 424 U.S. 1, 114-15 (1976); *see also Scott v. Pasadena Unified Sch. Dist.*, 306 F.3d 646, 662 (9th Cir. 2002) (noting that "where constitutional issues are concerned, problems such as the inadequacy of the record . . . will make a case unfit for adjudication on the merits") (internal quotation marks and citations omitted). The Court concludes that the controversy is ripe for adjudication.

## II.   MERITS OF CONSTITUTIONAL CLAIMS

### A.   *Due Process and Equal Protection Clause Claims*

#### 1.   Legal standard

The Due Process Clause protects plaintiffs' liberty interest to pursue a livelihood, *see Wedges/Ledges of California, Inc. v. City of Phoenix*, 24 F.3d 56, 65 n.4 (9th Cir. 1994), and the Equal Protection Clause requires that they not be subjected to statutory classifications, such as occupational licensing requirements, that are not at least rationally related to a legitimate state goal, *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 440 (1985); *see also, e.g.*, *Cornwell v. Hamilton*, 80 F. Supp. 2d 1101, 1103 (S.D. Cal. 1999); *Powers v. Harris*, 379 F.3d 1208, 1215-16 (10th Cir. 2004).

In considering plaintiffs' Equal Protection and Due Process Clause claims, the Court must determine whether the structural pest control licensing scheme challenged by plaintiffs is rationally related to a legitimate state purpose. *Williamson v. Lee Optical of OK*, 348 U.S. 483, 488 (1955) (Due Process Clause analysis); *City of Cleburne*, 473 U.S. at 440 (Equal Protection Clause analysis). Because both plaintiffs' due process claim and their equal protection claim trigger the same type of analysis of the licensing scheme, the following discussion does not distinguish between these claims. *Cf. Powers*, 379 F.3d at 1215 (conducting unified analysis of plaintiffs' Due Process and Equal Protection claims in analogous fact situation).

The Court must uphold the challenged scheme if "there is any reasonably conceivable state of facts that could provide a rational basis for" it. *FCC v. Beach Communications, Inc.*,

508 U.S. 307, 313 (1993). In conducting its analysis the Court must consider both whether the state purpose in question is legitimate and whether the challenged law is a "rational way to [address] it." *Williamson v. Lee Optical*, 348 U.S. at 488. A law may be rationally related to its purpose even if it does not advance that purpose with "mathematical exactitude" or "complete[ly] eliminat[e] the evil." *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976). However, there must be some relationship between the law and the purpose; "wholly arbitrary" legislative acts "cannot stand consistently with the Fourteenth Amendment." *Id.* at 304. The Court need not necessarily conclude that the posited purpose was the actual purpose of the legislature that enacted the challenged law. *Cf. Beach Communications*, 508 U.S. at 313; *Williamson v. Lee Optical*, 348 U.S. at 488.

    2.  Rationality of excluding plaintiffs from the exemption

Plaintiffs argue in substance that the existing Branch 2 licensing requirement violates the Due Process and Equal Protection Clauses because there is no rational basis for excluding them from the exemption that § 8555(g) granted to those engaged in the nonpesticide removal and exclusion of vertebrates other than rats, mice and pigeons, essentially wildlife. The Supreme Court upheld an analogous challenge to an exemption from occupational restrictions in *Dukes*, 427 U.S. at 298. The ordinance challenged in *Dukes* exempted pushcart operators who had operated the same business for eight years from a general prohibition against selling of foodstuffs from pushcarts in the French Quarter of New Orleans. The Court stated that as part of a local economic regulation, the discrimination imposed by the ordinance was entitled to a presumption of validity so long as it was "rationally related to a legitimate state interest." *Id.* at 303. The Court explained that "[s]tates are accorded wide latitude in the regulation of their local economies under their police powers, and rational distinctions may be made with substantially less than mathematical exactitude." *Id.* In upholding the ordinance, the Court explained that the city could legitimately seek to protect the charm and beauty of the French Quarter to ensure the economic vitality of the area, that reducing the number of street peddlers would be a reasonable approach to protecting the area's charm, and that excluding peddlers of more recent vintage would not be an arbitrary means of achieving this goal, since older peddlers would be likely to

13

have built up stronger established interests and were themselves more a part of the charm of the area. *Id.* at 304-05.

Similarly, the California legislature, in excluding those engaged in nonpesticide control of mice, rats, and pigeons from the licensing exemption in § 8555(g), could reasonably have found that continuing to require a Branch 2 license of these operators would further the State's legitimate interest in consumer protection and the public health and welfare.[11] It is rational to think that rats, mice and pigeons are overwhelmingly the most common vertebrate pests infesting structures and that other vertebrate pests tend to be present in structures rarely and incidentally. Thus, the distinction drawn in § 8555(g) is a rational one. This distinction is rationally related to the State's interest in protecting the health and welfare of the public. The State need not advance its interests "with mathematical exactitude," *Dukes*, 427 U.S. at 303, and the State could rationally conclude that its protection of the public would not be significantly affected by exclusion from the licensing requirement of those engaged in nonpesticide control of pests that make up a negligible proportion of the vertebrate structural pests in California. Further, it is not irrational for the State to require that all pest controllers who deal with rats, mice, and pigeons obtain Branch 2 licenses. The State may legitimately seek to protect the interests of pest control consumers by requiring that pest control operators be knowledgeable about alternative methods of control, about the public health hazards posed by pests, and about ways of protecting themselves and the public from pesticides previously applied by others to structural sites. It is rational to seek to attain this end by treating structural pest control as an integrated process of managing structural pests comprising the use of both pesticides and physical means of exclusion. Applying the Branch 2 requirement to those engaged in the control of rats, mice, and pigeons achieves this end.

For these reasons the Court cannot say that the legislature's judgment so lacks rationality that it constitutes a constitutionally impermissible denial of due process or equal protection.

---

[11] As noted above, since 1941 the Code has required structural pest controllers who do not use pesticides to acquire structural pest control licenses.

14

### C. Privileges and Immunities Clause Claim

As noted, plaintiffs also contend that the structural pest licensing scheme infringes their rights under the Privileges and Immunities Clause of the Fourteenth Amendment. *See, e.g.*, Pls.' Mot. at 23-24. Specifically, they argue that "the right to earn a living is a federal right" and that the Court should understand the Privileges and Immunities Clause to protect against infringements of this right. *See id.* (citing *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923)). Plaintiffs acknowledge that in the *Slaughter-House Cases*, 83 U.S. 36, 72-79 (1872), the Supreme Court limited the reach of the Fourteenth Amendment's Privileges and Immunities Clause to preclude, inter alia, claims by citizens "against the legislative power of their own State." *Craigmiles v. Giles*, 110 F. Supp. 2d 658, 665 (E.D. Tenn. 2000). Plaintiffs contend, however, that the Supreme Court effectively reversed that limitation in *Saenz v. Roe*, 526 U.S. 489, 506-07 (1999).

The plaintiffs in two recent challenges to occupational licensing schemes raised similar arguments based on the Fourteenth Amendment's Privileges and Immunities Clause. *Powers*, 312 F.3d at 229; *Craigmiles*, 379 F.3d at 1214. Both the Tenth Circuit and the Sixth Circuit rejected these arguments, noting that *Saenz* did not expressly overrule the *Slaughter-House Cases* and that the lower federal courts may not themselves overrule Supreme Court precedent. *Powers*, 312 F.3d at 229; *Craigmiles*, 379 F.3d at 1214. The Ninth Circuit recently reached the same conclusion in a different factual context. *Russell v. Hug*, 275 F.3d 812, 822 (9th Cir. 2000). In conformity with these interpretations of governing law, the Court concludes that because plaintiffs are asserting that their rights have been violated by actions of their own state, their claim for violation of their rights under the Privileges and Immunities Clause of the Fourteenth Amendment fails as a matter of law. *Cf. Craigmiles*, 110 F. Supp. 2d at 665-67.

### III. ABSTENTION

In their cross-motion, defendants urge the Court to abstain entirely from adjudication of plaintiffs' claims. Defs.' Mot. at 23-24. They note that the Supreme Court has held that

> where timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the

15

result of the case then at bar; or (2) where the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.

*New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 361 (1989) (internal quotation marks and citations omitted).  Defendants maintain that a decision for plaintiffs would "disrupt[] . . . state efforts to establish a coherent policy" regarding structural pest control.  Defs.' Mot. at 24 (quoting *New Orleans Pub. Serv.*, 491 U.S. at 361).

The questions addressed above are questions of whether a state statute violates federal constitutional law, not "difficult questions of state law."  *New Orleans Pub. Serv.*, 491 U.S. at 361.  The Court's abstention from deciding the issues presented by the parties' motions for summary judgment is not indicated.

## CONCLUSION

For the reasons stated, defendants' motion for summary judgment is **GRANTED** and plaintiffs' motion is **DENIED**.

**IT IS SO ORDERED.**

Dated:  July 15, 2005

WILLIAM W SCHWARZER
SENIOR UNITED STATES DISTRICT JUDGE