United States District Court

For the Northern District of California

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ALAN MERRIFIELD, et al.,** | No. C-04-0498 MMC (WWS) |
| **Plaintiff,** | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| **BILL LOCKYER, ATTORNEY GENERAL OF THE STATE OF CALIFORNIA, et al.,** | |
| **Defendants.** | |

Plaintiffs Alan Merrifield, owner and operator of a pest control business, and the California Nuisance Wildlife Control Operators' Association (CNWCOA), a trade association, have moved for summary judgment on their claims under 42 U.S.C. § 1983 against Defendants Kelli Okuma, Registrar and Executive Officer of the California Structural Pest Control Board (SPCB), and Jean Melton, Bill Morris, Michael Roth, Mustapha Sesay, Chris Arzate, and Kenneth L. Trongo, members of the SPCB, sued in their official capacities. Plaintiffs contend that no reasonable trier of fact could fail to find that Defendants' interpretation and enforcement of a state licensing scheme for structural pest controllers violates Plaintiffs' rights under the Due Process, Equal Protection, and Privileges & Immunities Clauses of the Fourteenth Amendment of the United States Constitution. Defendants have cross-moved for summary judgment on all

of Plaintiffs' claims, arguing that the claims cannot succeed on their merits and that this Court should abstain from deciding a question of state regulatory law.[1] Plaintiffs have also filed objections to some of the materials submitted by Defendants in support of their motion. For the reasons presented below, the Court grants Defendants' motion for summary judgment, denies Plaintiffs' motion for summary judgment, and sustains in part Plaintiffs' objections to evidence.

## BACKGROUND

### I. CALIFORNIA'S STRUCTURAL PEST CONTROL LICENSING SCHEME

Since 1941, the California Business & Professions Code has provided that a Structural Pest Control Board within the state's Department of Consumer Affairs will regulate those engaged in the business of "structural pest control."[2] CAL. BUS. & PROF. CODE § 8520. The Code makes it unlawful for "any individual to engage or offer to engage in the business or practice of structural pest control . . . unless he or she is licensed" in conformity with state law and the SPCB's requirements. *Id.* § 8550(a). The Code establishes a licensing scheme with three "branches." *Id.* § 8560(a). Branch 1 licenses are for those engaged in fumigation; Branch 2 licenses are for those engaged in "[g]eneral pest" control, defined as "[t]he practice relating to

---

[1] In their motion, in addition to responding to the merits of Plaintiffs' arguments, Defendants challenge Plaintiffs' ability to bring this suit. In light of its ruling on the merits, the Court need not address the question of Plaintiffs' standing or the ripeness of their challenge to the SPCB's implementation of the structural pest licensing scheme.

[2] The SPCB's "primary mission," according to the Code, is "consumer protection." CAL. BUS. & PROF. CODE § 8520. The Code defines "structural pest control" as including

> identification of infestations or infections; the making of an inspection or inspections for the purpose of identifying or attempting to identify infestations or infections of household or other structures by such pests or organisms; the making of inspection reports, recommendations, estimates, and bids, whether oral or written, with respect to such infestations or infections; and the making of contracts, or the submitting of bids for, or the performance of any work including the making of structural repairs or replacements, or the use of insecticides, pesticides, rodenticides, fumigants, or allied chemicals or substances, or mechanical devices for the purpose of eliminating, exterminating, controlling, or preventing infestations or infections of such pests, or organisms.

*Id.* § 8505. It defines "structural pests" as "household pests and wood destroying pests or organisms, or such other pests which may invade households or other structures, including railroad cars, ships, docks, trucks, airplanes, or the contents thereof." *Id.*

the control of household pests, excluding fumigation with poisonous or lethal gases"; and Branch 3 licenses are for those engaged in termite control. *Id.*

As noted, California has regulated structural pest control providers since 1941. Under the statutory scheme, persons providing general nonpesticide structural pest control services, like Plaintiffs, along with those using pesticides, have been continuously regulated and required to obtain Branch 2 licenses. In 1995, the California legislature amended the Code to create an exemption for

> [p]ersons engaged in the live capture and removal or exclusion of vertebrate pests, bees, or wasps from a structure without the use of pesticides. . . . "Vertebrate pests" include, but are not limited to, bats, raccoons, skunks, and squirrels, but do not include mice, rats, or pigeons.

*Id.* § 8555(g). Because they are exempted, such persons may engage in "structural pest control" without a license. *Id.* § 8555. But because the exemption excludes mice, rats, and pigeons from its definition of "vertebrate pests," individuals remain subject to the licensure requirement if they "engage[] in the live capture and removal or exclusion of" mice, rats, or pigeons. *Id.* § 8555(g). The SPCB, charged with administration of the Code's licensing scheme, interprets this provision as requiring that individuals engaged in nonpesticide pest control must obtain a Branch 2 license if their activities might affect or involve the exclusion of mice, rats, or pigeons. *See, e.g.*, Ex. A to Decl. of Timothy Sandefur, at 37:4-8, 24:11-19.

To obtain a Branch 2 license, an individual must present proof that he or she has had at least two years of "actual experience . . . or the equivalent"[3] working in "the particular branch" for which a license is desired. CAL. BUS. & PROF. CODE § 8562(b). Since 1993, each applicant has also been required to provide proof of a year of experience as a licensed Branch 2 "field representative." *Id.* § 8562(f). Finally, the applicant must pass the SPCB-created Branch 2 exam with a score of 70% or better. *Id.* §§ 8560(a), (f). In support of their motion, Plaintiffs submitted a single sample Branch 2 exam as well as materials released by the SPCB to assist applicants in preparing for the exam and describing its coverage. Exs. E, K to Pls.' Mot. Most,

---

[3]The Code defines one year of experience as equaling "1,600 hours of actual experience in the field." CAL. BUS. & PROF. CODE § 8562(b).

3

but not all, of the subject areas described in the preparation materials relate to the use and storage of pesticides and/or the identification and control of invertebrate pests. *See* Ex. K to Pls.' Mot. Of the 200 questions on the sample exam supplied, at most 18 questions relate to mice, rats, and/or nonrodenticide-based mouse or rat control. Ex. E to Plfs.' Mot. A further six questions on compliance procedures are possibly applicable to all pest-control enterprises. *Id.* One question concerns bat droppings. *Id.* All of the remaining questions pertain to invertebrate pest control or the use of pesticides, or to both subjects. *Id* No questions concern bird control, with or without chemicals. *Id.*

As noted, the Code makes it unlawful for an individual to engage in structural pest control without a license. CAL. BUS. & PROF. CODE § 8550. The Code makes violation of this requirement a misdemeanor punishable by up to $1000 and six months in jail for each violation. *Id.* § 8553. Under the Code it is also a misdemeanor "for any person to submit a bid to a public agency . . . without having a license therefor." *Id.* § 7028.15(a).

Materials supplied by Plaintiffs indicate that the SPCB has authority to and does in fact enforce these licensing requirements. *See* Pls.' Mot. at 5-6, 9. The SPCB does not dispute that it has fined one business for bidding on a public contract without a Branch 2 license, *id.* at 5, and issued a cease-and-desist order to another business without a Branch 2 license engaged in installing anti-pigeon netting on residences, *id.* at 6. Plaintiff Merrifield submitted materials dating from 2001 reflecting correspondence with California state officials confirming that without a Branch 2 license he would not be permitted to bid on a contract for pigeonproofing a state government building in San Francisco. Exs. C-F to Decl. of Alan J. Merrifield. Merrifield also submitted materials from 2003 indicating rejection of his bid for a contract to birdproof the Trans Bay Terminal in San Francisco, in part on the basis of Merrifield's lack of a Branch 2 license. Exs. G-K to Merrifield Decl. Finally, Merrifield submitted a copy of a "Warning Letter" that the SPCB sent him on February 21, 1997. Ex. M to Merrifield Decl. The letter contains the following language:

> Existing law generally requires a person or entity engaged in the practice of structural pest control to be licensed by the Structural Pest Control Board. . . .

> It has come to the Board's attention that you do not posses [sic] the proper Branch II (General Pest Control) License or Company Registration Certificate issued by the Board. It is also apparent that you are advertising and conducting Rodent Proofing (rats, mice, etc.) activities.
>
> If you or your firm is conducting any pest control activity or advertisement which requires a Branch II License or Company Registration Certificate, you are ordered to cease and desist all activity unless properly licensed or are [sic] in compliance with Section 8555(g) Business and Professions Code.
>
> This notice will be your only warning that any firm or person which violates the provisions of the Structural Pest Control Act will be investigated and appropriate legal action will be initiated through the District Attorney's Office. Compliance with these requirements . . . shall be mandatory by March 31, 1997.

*Id.*

## II.   PROCEDURAL BACKGROUND

Plaintiff Merrifield owns and operates Urban Wildlife Management, Inc. (UWM), a company engaged in "animal damage prevention and bird control" (ADP&BC). UWM is also a plaintiff in this action. UWM's business consists of "installing [devices such as] screens, spikes, one-way doors, or even plastic owls on buildings to deter wildlife from entering a structure, or to get the animal to leave permanently." Pls.' Mot. at 3; *see also* Merrifield Decl. ¶¶ 10-11. UWM sometimes also installs electronically operated devices to achieve these goals. Pls.' Mot. at 3. UWM does not use pesticides to control animals or birds. *Id.* Plaintiff CNWCOA is a trade group of businesses that, like UWM, are "engaged in the nonpesticide removal or exclusion of vertebrate pests." *Id.* at 6. Plaintiffs assert that "many of its members do not have Branch 2 licenses." *Id.*

Plaintiffs initiated this action in February 2004.[4] On May 10, 2004, Plaintiffs filed a First Amended Complaint (FAC), naming as Defendants in their official capacities Bill Lockyer, Attorney General of the State of California; Jean Melton, Bill Morris, Michael Roth, Mustapha Sesay, Karl Thurmond, and Kenneth L. Trongo, members of the SPCB; and Kelli Okuma,

---

[4] In their original and amended complaints, Plaintiffs named as Defendants a number of additional state officials, including Arnold Schwarzenegger, Governor of the State of California, and Valerie Brown, California Assemblywoman. Plaintiffs sued all Defendants in their individual capacities. Dkt. Nos. 1, 5. Two groups of Defendants filed separately to dismiss the complaint, on the grounds that (1) Plaintiffs failed to allege a justiciable case or controversy, and (2) Plaintiffs failed to state a claim on which relief could be granted. Dkt. Nos. 6, 7. By order filed April 21, 2004, the Court (Chesney, J.) granted the motions to dismiss with leave to amend. Dkt. No. 21.

5

Registrar of the SPCB. Dkt. No. 28. Plaintiffs alleged that the structural pest control licensing scheme, as interpreted and enforced by Defendants, violated Plaintiffs' rights under the Due Process, Equal Protection, and Privileges and Immunities Clauses of the Fourteenth Amendment and requested declaratory and injunctive relief. Lockyer and the SPCB Defendants moved separately to dismiss the FAC. Dkt. Nos. 44-46.

By Order filed July 16, 2004, the Court (Chesney, J.) granted Lockyer's motion but denied the motion of the SPCB Defendants. As to Lockyer, the Court held that because Plaintiffs had not "alleged that Lockyer ha[d] filed or threatened to file an action against any plaintiff," they had failed to allege a case or controversy against him. Order Den. SPCB Defs.' Mot. to Dismiss, *Merrifield v. Schwarzenegger*, No. 04-0498 MMC, at 6 (N.D. Cal. July 16, 2004) (Dkt. No. 60).[5] On the merits, the Court identified the central issue in the case as the question whether § 8555(g) was rationally related to a legitimate government purpose. *See* Order of July 16, 2004, at 7. The Court concluded that the "issue of whether the Legislature lacked a rational basis to require nonpesticide ADP&BC providers to obtain a Branch 2 License [wa]s premature." *Id.* at 8. On May 6, 2005, Defendants filed a first motion for summary judgment, accompanied by supporting exhibits and a forty-page Memorandum of Points and Authorities. Dkt. No. 85. After issuing an order to show cause why the motion should not be stricken for failure to comply with Civil Local Rule 7-2(b) (imposing 25-page limit on motions), the Court ordered the motion stricken. Dkt. Nos. 107, 113. On May 5, 2005, Plaintiffs filed their own motion for summary judgment, with supporting exhibits. Dkt. Nos. 86-89, 91-99, 101-06. Defendants refiled a motion for summary judgment on May 20, 2005. Dkt. No. 114. By Order dated June 2, 2005, the matter was referred to Judge William W Schwarzer. Dkt. No. 119. The parties' motions for summary judgment, with supporting materials, and Plaintiffs' objections to evidence are now before the Court.

---

[5]In reaching this conclusion, the Court rejected Defendants' argument that Plaintiffs' claimed injuries could be redressed only by the California legislature. *See* Order of July 16, 2004, at 6-7. Defendants raise this argument again in their cross-motion for summary judgment. *See* Defs.' Mot. at 11-12. Because Plaintiffs are challenging the SPCB's interpretation and enforcement of the structural pest licensing scheme and requirements, the Court again rejects Defendants' contention that the SPCB is not a proper defendant in this action.

6

**LEGAL STANDARDS**

Summary judgment is indicated when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323-34 (1986). Any "[s]upporting [or] opposing affidavits [must] be made on personal knowledge, . . . set forth such facts as would be admissible in evidence, and . . . show affirmatively that the affiant is competent to testify to the matters stated therein." FED. R. CIV. P. 56(e).

**DISCUSSION**

**I. CONSTITUTIONAL CLAIMS**

   *A.   Due Process and Equal Protection Clause Claims*

      1.   Legal standard

The Due Process Clause protects plaintiffs' liberty interest in pursuing a livelihood, *see Wedges/Ledges of California, Inc. v. City of Phoenix*, 24 F.3d 56, 65 n.4 (9th Cir. 1994), and the Equal Protection Clause requires that they not be subjected to statutory classifications, such as occupational licensing requirements, that are not at least rationally related to a legitimate state goal, *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 440 (1985); *see also, e.g.*, *Cornwell v. Hamilton*, 80 F. Supp. 2d 1101, 1103 (S.D. Cal. 1999); *Powers v. Harris*, 379 F.3d 1208, 1215-16 (10th Cir. 2004).

In considering Plaintiffs' Equal Protection and Due Process Clause claims, the Court must determine whether the structural pest control licensing scheme that Plaintiffs challenge is rationally related to a legitimate state purpose. *Williamson v. Lee Optical of Okla.*, 348 U.S. 483, 488 (1955) (Due Process Clause analysis); *City of Cleburne*, 473 U.S. at 440 (Equal Protection Clause analysis). The Court must uphold the challenged scheme if "there is any reasonably conceivable state of facts that could provide a rational basis for" it. *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313 (1993). In conducting its analysis the Court must consider both whether the state purpose in question is legitimate and whether the challenged law is a "rational way to [address] it." *Williamson v. Lee Optical*, 348 U.S. at 488. A law may be

7

rationally related to its purpose even if it does not advance that purpose with "mathematical exactitude" or "complete[ly] eliminat[e] the evil." *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976). However, there must be some relationship between the law and the purpose; "wholly arbitrary" legislative acts "cannot stand consistently with the Fourteenth Amendment." *Id.* at 304. The Court need not conclude that the posited purpose was the actual purpose of the legislature that enacted the challenged law. *Cf. Beach Communications*, 508 U.S. at 313; *Williamson v. Lee Optical*, 348 U.S. at 488.

Plaintiffs' equal protection claim challenges primarily the rationality of the exemption created by CAL. BUS. & PROF. CODE § 8555(g) and implemented by the SPCB, that is, the distinction made in the statute itself. Their due process claim challenges the rationality of the SPCB's implementation of its occupational licensing scheme through administration of a test consisting mostly of questions on subjects unrelated to the type of work Plaintiffs perform. The discussion below addresses each of these arguments in turn.

    2.   Equal Protection Clause claim

Plaintiffs argue in substance that the existing Branch 2 licensing requirement violates the Equal Protection Clause because there is no rational basis for excluding them from the exemption that § 8555(g) granted to those engaged in the nonpesticide removal and exclusion of vertebrates other than rats, mice and pigeons, essentially wildlife. The Supreme Court upheld an analogous challenge to an exemption from occupational restrictions in *Dukes*, 427 U.S. at 298. The ordinance challenged in *Dukes* exempted pushcart operators who had operated the same business for eight years from a general prohibition against selling of foodstuffs from pushcarts in the French Quarter of New Orleans. The Court stated that as part of a local economic regulation, the discrimination imposed by the ordinance was entitled to a presumption of validity so long as it was "rationally related to a legitimate state interest." *Id.* at 303. The Court explained that "[s]tates are accorded wide latitude in the regulation of their local economies under their police powers, and rational distinctions may be made with substantially less than mathematical exactitude." *Id.* In upholding the ordinance, the Court explained that the city could legitimately seek to protect the charm and beauty of the French Quarter to ensure the

economic vitality of the area, that reducing the number of street peddlers would be a reasonable approach to protecting the area's charm, and that excluding peddlers of more recent vintage would not be an arbitrary means of achieving this goal, since older peddlers would be likely to have built up stronger established interests and were themselves more a part of the charm of the area. *Id.* at 304-05.

Similarly, the California legislature, in excluding those engaged in nonpesticide control of mice, rats, and pigeons from the licensing exemption in § 8555(g), could reasonably have found that continuing to require a Branch 2 license of these operators would further the State's legitimate interests in consumer protection and the public health and welfare.[6] It is rational to think that rats, mice and pigeons are overwhelmingly the most common vertebrate pests infesting structures and that in comparison other vertebrate pests tend to be present inside structures rarely and incidentally. Thus, the distinction drawn in § 8555(g) is a rational one. This distinction is rationally related to the State's interest in protecting the health and welfare of the public. The State need not advance its interests "with mathematical exactitude," *Dukes*, 427 U.S. at 303, and the State could rationally conclude that its protection of the public would not be significantly affected by exclusion from the licensing requirement of those engaged in nonpesticide control of pests that make up a negligible proportion of the vertebrate structural pests in California. Further, it is not irrational for the State to require that all pest controllers who deal with rats, mice, and pigeons obtain Branch 2 licenses. The State may legitimately seek to protect the interests of pest control consumers by requiring that pest control operators be knowledgeable about alternative methods of control, about the public health hazards posed by pests, and about ways of protecting themselves and the public from pesticides previously applied by others to structural sites. It is rational to seek to attain this end by treating structural pest control as an integrated process of managing structural pests comprising the use of both pesticides and physical means of exclusion. Applying the Branch 2 requirement to those engaged in the control of rats, mice, and pigeons achieves this end.

---

[6] As noted above, since 1941 the Code has required structural pest controllers who do not use pesticides to acquire structural pest control licenses.

For these reasons, the Court cannot say that the legislature's creation of the exemption in CAL. BUS. & PROF. CODE § 8555(g) so lacks rationality that it constitutes a constitutionally impermissible denial of equal protection.

### 3. Due Process Clause claim

Plaintiffs also argue that the SPCB's implementation of the structural pest control licensing scheme violates their rights under the Due Process Clause by depriving them of their liberty interest in pursuing their chosen livelihood, since it requires them to study for and pass an examination overwhelmingly testing subjects unrelated to the work they actually perform. For the reasons presented below, the Court concludes the SPCB's implementation of the scheme is not so arbitrary and irrational as to amount to a violation of Plaintiffs' due process rights.

The Supreme Court has noted that "[i]t is undoubtedly the right of every citizen of the United States to follow any lawful calling, business, or profession he may choose." *Dent v. West Virginia*, 129 U.S. 114, 121 (1889); *see also Wedges/Ledges*, 24 F.3d at 65 n.4. Nevertheless, a State may require practitioners of a particular business or profession to satisfy occupational licensing or certification requirements without violating those practitioners' constitutional rights, so long as the "qualifications required" "are appropriate to the calling or profession, and attainable by reasonable study or application." *Id.* at 122. "The . . . qualifications required must depend primarily upon the judgment of the state as to their necessity." *Id.* However, denying an individual the right to engage in a lawful occupation may violate the individual's due process rights when the denial is based on application of a clearly arbitrary standard with no "rational connection" to the applicant's "fitness or capacity to practice" the occupation. *Schware v. Bd. of Bar Examiners of N. M.*, 353 U.S. 232, 240 (1957).

As noted, Plaintiffs argue that the Branch 2 licensing requirements, and in particular the examination requirement, are clearly arbitrary and irrational because the examination includes no questions relating to bird control, few questions relating to rat or mouse identification, and a very large number of questions relating to the use of pesticides and the control of invertebrate pests. In support of their argument Plaintiffs point to two cases in which courts held that occupational licensing schemes requiring education and examination on subjects unrelated to

10

1  the applicants' actual occupational activities violated the plaintiffs' due process and equal
2  protection rights. *Cornwell,* 80 F. Supp. 2d at 1103 (holding that application of a California
3  cosmetology licensing requirement to a plaintiff engaged in African hair braiding violated
4  plaintiff's due process and equal protection rights); *Craigmiles v. Giles*, 312 F.3d 220, 225-27
5  (6th Cir. 2002) (holding that Tennessee statute requiring casket merchants to obtain funeral
6  director licenses through extensive education and examination violated the merchants' due
7  process and equal protection rights). *But see Powers v. Harris*, 379 F.3d 1208, 1222-25 (10th
8  Cir. 2004) (rejecting analysis used in *Craigmiles* and upholding substantially identical
9  Oklahoma statute requiring casket merchants to obtain funeral director licenses). The cases
10 relied on by Plaintiffs are analogous in certain respects to the present case, but the Court
11 concludes that important differences between the occupational fields at issue preclude direct
12 application of *Cornwell*, 80 F. Supp. 2d 1101, and *Craigmiles*, 312 F.3d 220, to this case.
13     In *Craigmiles*, the District Court for the Eastern District of Tennessee, after a bench trial,
14 found that neither caskets themselves nor the sale of caskets implicated "public health and
15 safety" in any way. *Craigmiles v. Giles*, 110 F. Supp. 2d 658, 662 (E.D. Tenn. 2000). Thus,
16 requiring the licensing of casket merchants could have no rational relationship to the protection
17 of public health and safety. *See id.* The district court also found that requiring the licensing of
18 casket merchants would not protect consumers from fraud and overreaching, but rather would
19 tend to harm consumers by decreasing competition among casket merchants. *Id.* at 664. On
20 appeal, the Sixth Circuit noted the district court's inability to find any rational basis for the
21 licensing requirement and concluded that the requirement could be explained only as "an
22 attempt to prevent economic competition" with funeral directors. 312 F.3d at 225. Because the
23 law both lacked a rational relationship to any legitimate state end and had been enacted for what
24 the Sixth Circuit concluded was an illegitimate purpose, the court held that the statute violated
25 the Equal Protection and Due Process Clauses. *Id.*
26     The circumstances present here differ from those addressed in *Craigmiles* in several
27 ways. The purchase of a casket is a straightforward sales transaction involving a discrete
28 product. In contrast, the purchase of structural pest control solutions is the purchase of a service

11

(installation or application of the pest control solutions) as well as of a product or products. This service will involve each pest control operator with particular sites that will in many cases have been previously visited and treated with pesticides or other solutions by other operators. Casket merchants do not face a similar situation. Also, it would be rational to conclude that purchasers of structural pest control services are less likely than purchasers of caskets to be knowledgeable about their needs concerning the particular item or service purchased. *See Craigmiles*, 110 F. Supp. 2d at 664 (discussing absence of evidence suggesting any need for casket purchasers' advice regarding appropriate caskets). In particular, purchasers of structural pest control services may be unaware of hazards arising from the past or current presence of pests, their parasites, or pesticides at the site in question. For all of these reasons, the provision of structural pest control services directly implicates public health and safety in a way that the sale of caskets does not. *Cf. id.* at 662. Thus, as discussed above, requiring the licensure of structural pest control operators may be said to have a rational relationship to the protection of public health and safety. Further, for the reasons mentioned, it is rational to require such operators to be knowledgeable about issues closely related to the services they provide and likely to arise in the course of provision of those services. *Cf. id.* at 660 (describing funeral director certification requirements).

Plaintiffs also urge the Court to adopt the analysis used by the District Court for the Southern District of California in *Cornwell.* 80 F. Supp. 2d 1101. That case involved an as-applied challenge to the State's cosmetology licensing requirement. *Id.* at 1102. The court found that the plaintiff, whose business consisted of African hair braiding or "natural hair care," could not "be reasonably classified as a cosmetologist as it is defined and regulated presently," but that "[e]ven if [she] were defined to be a cosmetologist, the licensing regimen would be irrational as applied to her because of her limited range of activities," which overlapped only minimally with the types of activities covered in the State's principal training curriculum and examination. *Id.* at 1008; *see also id.* at 1110 (finding "well below ten percent" of the curriculum to be relevant to plaintiff's actual activities), 1115 (finding 11% of exam questions to be relevant to plaintiff's actual activities). The court stressed that this minimal overlap meant

12

that the cosmetology licensing requirements could not rationally be said to ensure that those engaged in natural hair care would become competent practitioners of their chosen profession. *Id.* at 1112 (noting, accordingly, that "the current licensing regimen may work against the State's professed interest in health and safety"). The court also found it relevant that the licensing requirements were overwhelmingly oriented toward non-African hair care techniques, *see id.* at 1104-05, 1112, 1114-15, 1115 n.43, 1117, and that the licensing scheme might have the effect of protecting a "'cartel for cosmetology services,'" *id.* at 1117-18.

In urging application of a similar approach here, Plaintiffs focus on the fact that at most 24, or 12%, of the 200 questions on the sample Branch 2 exam provided relate to activities undertaken by ADP&BC professionals. This focus overlooks important differences between the activities undertaken by hair care professionals or cosmetologists and structural pest control operators. Although both fields involve the provision of services, and both may affect consumer safety through use of chemicals, structural pest control remains different from hair care for many of the reasons cited above. Natural hair care specialists do not by definition work within environments characterized by threats to public health and safety. It is irrational to require hair care specialists who do not work in hazardous environments to become informed about hazards that their work never requires them to encounter. Structural pest control operators' work, in contrast, by definition involves pest-ridden environments and thus brings structural pest control operators into direct contact with potential threats to public health. It is not irrational for the State to require that structural pest control operators be knowledgeable about these threats and competent to advise consumers about them.

The Court concludes that neither *Craigmiles*, 110 F. Supp. 2d 658, *aff'd*, 312 F.3d 220, nor *Cornwell*, 80 F. Supp. 2d 1101, involved occupational circumstances sufficiently analogous to those in the present case to indicate a similar result here. The Court cannot say that the SPCB's implementation of the Branch 2 licensing requirement bears "no relation to [Plaintiffs'] calling or profession" or that the scheme makes a Branch 2 license "unattainable by . . . reasonable study or application." *Dent*, 129 U.S. at 122. The Court therefore cannot conclude

13

that the Branch 2 licensing requirements are so unrelated to a legitimate state purpose as to violate the due process rights of structural pest control operators in Plaintiffs' position.

        C.     *Privileges and Immunities Clause Claim*

As noted, Plaintiffs also contend that the structural pest licensing scheme infringes their rights under the Privileges and Immunities Clause of the Fourteenth Amendment. *See, e.g.*, Pls.' Mot. at 23-24. Specifically, they argue that "the right to earn a living is a federal right" and that the Court should understand the Privileges and Immunities Clause to protect against infringements of this right. *See id.* (citing *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923)). Plaintiffs acknowledge that in the *Slaughter-House Cases*, 83 U.S. 36, 72-79 (1872), the Supreme Court limited the reach of the Fourteenth Amendment's Privileges and Immunities Clause to preclude, inter alia, claims by citizens "against the legislative power of their own State." *Craigmiles v. Giles*, 110 F. Supp. 2d 658, 665 (E.D. Tenn. 2000). Plaintiffs contend, however, that the Supreme Court effectively reversed that limitation in *Saenz v. Roe*, 526 U.S. 489, 506-07 (1999).

The plaintiffs in two recent challenges to occupational licensing schemes raised similar arguments based on the Fourteenth Amendment's Privileges and Immunities Clause. *Powers*, 312 F.3d at 229; *Craigmiles*, 379 F.3d at 1214. Both the Tenth Circuit and the Sixth Circuit rejected these arguments, noting that *Saenz* did not expressly overrule the *Slaughter-House Cases* and that the lower federal courts may not themselves overrule Supreme Court precedent. *Powers*, 312 F.3d at 229; *Craigmiles*, 379 F.3d at 1214. The Ninth Circuit recently reached the same conclusion in a different factual context. *Russell v. Hug*, 275 F.3d 812, 822 (9th Cir. 2000). In conformity with these interpretations of governing law, the Court concludes that because Plaintiffs are asserting that their rights have been violated by actions of their own State, their claim for violation of their rights under the Privileges and Immunities Clause of the Fourteenth Amendment fails as a matter of law. *Cf. Craigmiles*, 110 F. Supp. 2d at 665-67.

**III.   ABSTENTION**

In their cross-motion, Defendants urge the Court to abstain entirely from adjudication of Plaintiffs' claims. Defs.' Mot. at 23-24. They note that the Supreme Court has held that

> where timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result of the case then at bar; or (2) where the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.

*New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 361 (1989) (internal quotation marks and citations omitted). Defendants maintain that a decision for Plaintiffs would "disrupt[] . . . state efforts to establish a coherent policy" regarding structural pest control. Defs.' Mot. at 24 (quoting *New Orleans Pub. Serv.*, 491 U.S. at 361).

The questions addressed above are questions of whether a state statute violates federal constitutional law, not "difficult questions of state law." *New Orleans Pub. Serv.*, 491 U.S. at 361. The Court's abstention from deciding the issues presented by the parties' motions for summary judgment is not indicated.

## IV. PLAINTIFFS' OBJECTIONS TO DEFENDANTS' EVIDENCE

As noted, Plaintiffs have filed evidentiary objections to materials supplied by Defendants in support of their motion for summary judgment, specifically portions of the Declarations of Kelli Okuma and Eric Paulsen. Dkt. No. 141. Federal Rule of Civil Procedure 56(e) requires that declarations or affidavits supporting a motion for summary judgment be "made on personal knowledge, . . . set forth such facts as would be admissible in evidence, and . . . show affirmatively that the affiant [or declarant] is competent to testify to all matters testified therein." Below the Court considers in turn Plaintiffs' objections to the two declarations.

### A. Declaration of Kelli Okuma

Defendants supplied an eleven-paragraph declaration from Kelli Okuma, registrar of the SPCB, in support of their motion for summary judgment. Plaintiffs object to paragraphs 1 through 6 of this declaration as irrelevant and to paragraphs 7 and 8 as lacking any foundation in Okuma's personal knowledge.

15

Paragraphs 1 and 2 of Okuma's declaration set forth her position with the SPCB and her knowledge of Plaintiffs and the present lawsuit. These paragraphs address Okuma's competence and knowledge of pertinent issues and are thus relevant. *See* FED. R. EVID. 602.

Paragraphs 3 through 6 of Okuma's declaration address information before the legislature that enacted the 1995 exemption contained in California Business & Professions Code § 8555(g), as well as the alleged historical reasons for the enactment of that legislation. As noted above, when the Court reviews legislation or state action for a rational basis, the actual purpose of the legislature or state actor is not the focus of the inquiry. *See Beach Communications*, 508 U.S. at 313; *Williamson v. Lee Optical*, 348 U.S. at 488. The information contained in these paragraphs therefore pertains to facts not relevant to the questions before the Court. *See* FED. R. EVID. 401, 402. The Court sustains Plaintiffs' objections to these paragraphs as irrelevant.

Paragraphs 7 and 8 of Okuma's declaration largely recite the range of and weight assigned to various subject matters covered by the Branch 2 examination. Contrary to Plaintiffs' contention, these paragraphs do not address the "content" of particular examinations. In support of their own motion, Plaintiffs supplied SPCB-issued guidelines containing information substantially similar to that in these two paragraphs of Okuma's motion. *See* Ex. K to Sandefur Decl. The Court concludes that the information set forth in these paragraphs is within the scope of Okuma's personal knowledge as the SPCB registrar and declines to sustain Plaintiffs' objections as to paragraphs 7 and 8.

B.   *Declaration of Eric Paulsen*

Defendants submitted a twenty-one-paragraph declaration from Eric Paulsen, a structural pest control operator and consultant, in support of their motion for summary judgment. Plaintiffs object to large portions of this declaration on a variety of grounds.

Plaintiffs generally contend that paragraphs 13, 14, 15, 17, 18, and 20 of Paulsen's declaration contain expert testimony and that Paulsen is not qualified as an expert on the matters in question because he lacks formal education in pest control, is not a member of the honorary society of pest control specialists, is not a board-certified entomologist, and has admitted he is

16

not an expert on certain matters. The Court concludes that Paulsen's more than twenty years of experience in the field of structural pest control, as described in paragraphs 1 and 2 of his declaration, suffice to qualify him "as an expert by knowledge, skill, experience, training, or education" in the field of structural pest control. FED. R. EVID. 702. The Federal Rules of Evidence do not require formal education or board certification for qualification as an expert.

Plaintiffs object to paragraph 13 of Paulsen's declaration, pertaining to the reasons for enactment of California Business & Professions Code § 8555(g), as outside the scope of Paulsen's expertise, irrelevant, and lacking foundation. For the reasons discussed above in connection with Plaintiffs' objections to paragraphs 3 through 6 of Okuma's declaration, the Court sustains this objection to paragraph 13 of Paulsen's declaration. In addition, Plaintiffs object to paragraph 5 of Paulsen's declaration, also containing statements about the reasons for enactment of the § 8555(g) exemption, on the ground that it is irrelevant. Although this objection does not turn on Paulsen's qualifications as an expert, the Court also sustains this objection to paragraph 5 as irrelevant, for the reasons noted above in discussion of Okuma's declaration.

Plaintiffs object to paragraphs 14, 15, 17, and 18 as containing information outside the scope of Paulsen's expertise. Paragraph 14 addresses the ectoparasite and disease hazards associated with structural pests; paragraph 15 addresses the hazards posed by the feces and urine of vertebrate structural pests; paragraph 17 addresses the function of licensing examinations in ensuring operators' knowledge of these and other hazards; and paragraph 18 concerns the importance of requiring those structural pest control operators who do not use pesticides to gain knowledge of pesticide use and hazards nevertheless. The Court concludes that these general statements of opinion regarding the field of structural pest control and its occupational requirements are within the scope of Paulsen's expertise, as set out in paragraphs 1 and 2 of his declaration.[7] *See* FED. R. EVID. 702, 703, 704.

---

[7]Plaintiffs also object to "Defendants' characterization" of the information contained in paragraph 16 of Paulsen's declaration as "improper and misleading." Pls.' Obj. to Evid. Offered in Support of Defs.' Mot. at 7-8. Paragraph 16 concerns the need for structural pest control operators to

(continued...)

United States District Court
For the Northern District of California

Plaintiffs object to paragraph 20 of Paulsen's declaration as containing irrelevant material. Paragraph 20 contains general statements concerning the need for a licensing scheme to ensure the accountability of pest control operators. These statements pertain only to licensing in the abstract and do not address the issues presented by Plaintiffs' constitutional claims, namely, the rationality of § 8555(g) and the SPCB's implementation of the Branch 2 licensing requirement. For this reason, the Court sustains Plaintiffs' objections to the statements in paragraph 20 as irrelevant.

Plaintiffs object to Paulsen's statement in paragraph 21 that mice, rats, and pigeons are "the most common and destructive vertebrate pests" as lacking any foundation and as contradicted by Paulsen's deposition statements that he is not an expert with regard to other vertebrate structural pests such as raccoons and squirrels. The Court concludes that this statement is a legitimate statement of opinion within the scope of Paulsen's expertise in the field of structural pest control. Indeed, the fact that Paulsen elsewhere admits to a lack of expertise regarding the behavior and control of such vertebrate pests as raccoons and squirrels may be taken to confirm, rather than contradict, his statement regarding the commonness of mice, rats, and pigeons. If these other pests are indeed rare, as Paulsen asserts, then the experience that qualifies him as an expert in the field of structural pest control would have provided him with little exposure to these pests or their control.

Finally, Plaintiffs object to statements in paragraph 6 of Paulsen's declaration, concerning "the true heart" and purpose of the SPCB, as lacking foundation and being based on speculation. Plaintiffs note that Paulsen has never served on the SPCB and has never worked as an SPCB investigator, although he has served on an SPCB advisory board. Plaintiffs also maintain that the SPCB's purpose is a legal question to be assessed by the Court and not shown

---

[7](...continued) know about diseases associated with vertebrate structural pests and the need for a licensing system ensuring the accountability of such operators. According to Plaintiffs, Defendants characterized this paragraph as establishing that pigeons, rats, and mice may transmit specific diseases to humans. The paragraph does not contain such information, but the Court did not consider Defendants' statement to the contrary in its analysis of the merits of Plaintiffs' constitutional arguments. The question of which specific diseases might be carried or transmitted by mice, rats, and pigeons is irrelevant to the question whether the legislature might rationally conclude that the presence of these vertebrate pests in structures poses threats to public health and safety.

through evidentiary submissions. The Court concludes that these statements are relevant to the extent they present opinions regarding the reasons a State might seek to regulate the field of structural pest control generally. The Court also concludes that the declaration supplies sufficient foundation for these opinions, which are legitimately based on Paulsen's experience in the field of structural pest control and work with bodies regulating that field. The statements are irrelevant to the extent they relate to the actual purposes and motivations of the SPCB and its members, a matter on which the Court agrees that Paulsen is not competent to present an opinion. *See* FED. R. EVID. 702, 703; *Beach Communications*, 508 U.S. at 313; *Williamson v. Lee Optical*, 348 U.S. at 488. However, since the Court did not consider the statements for this purpose, the Court declines to sustain Plaintiffs' objections to the statements in this regard.

## CONCLUSION

For the reasons stated, Defendants' motion for summary judgment is **GRANTED** and Plaintiffs' motion is **DENIED**. Plaintiffs' objections to evidence are sustained as to paragraphs 3 through 6 of the Declaration of Kelli Okuma and as to paragraphs 5, 13, and 20 of the Declaration of Eric Paulsen.

**IT IS SO ORDERED.**

Dated: August 1, 2005

_____
WILLIAM W SCHWARZER
SENIOR UNITED STATES DISTRICT JUDGE