**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ALAN MERRIFIELD, an individual;
URBAN WILDLIFE MANAGEMENT
INC., a California corporation
individually as a successor in
interest to Alan Merrifield dba
Urban Wildlife Management;
CALIFORNIA NUISANCE WILDLIFE
CONTROL OPERATORS ASSOCIATION,
a California non-profit corporation,
                *Plaintiffs-Appellants,*

v.

BILL LOCKYER, Attorney General,
                *Defendant,*

and

KELLI OKUMA, Registrar of the
California Structural Pest Control
Board; GRETCHEN A. BRIGAMAN,
Protest Officer of the California
Department of Transportation;
JEAN MELTON, Member of the
California Structural Pest Control
Board; BILL MORRIS, Member of
the California Structural Pest
Control Board; MICHAEL ROTH,
Member of the California
Structural Pest Control Board;
MUSTAPHA SESAY, Member of the

No. 05-16613

D.C. No.
CV-04-00498-MMC

ORDER
AMENDING
OPINION AND
AMENDED
OPINION

14673

California Structural Pest Control
Board; Thurman, Member of the
California Structural Pest Control
Board; Kenneth L. Trongo,
Member of the California
Structural Pest Control Board,
                    *Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of California
Maxine M. Chesney, District Judge, Presiding

Argued and Submitted
August 16, 2007—San Francisco, California

Filed September 16, 2008
Amended October 22, 2008

Before: Diarmuid F. O'Scannlain, Michael Daly Hawkins,
and Kim McLane Wardlaw, Circuit Judges.

Opinion by Judge O'Scannlain;
Partial Concurrence and Partial Dissent by Judge Hawkins

## COUNSEL

Timothy Sandefur, Pacific Legal Foundation, Sacramento, California, argued the cause for the plaintiffs-appellants and filed briefs; Meriem L. Hubbard, Pacific Legal Foundation, Sacramento, California, was on the briefs.

Diann Sokoloff, Deputy Attorney General, Oakland, California, argued the cause for the defendants-appellees and filed a brief; Bill Lockyer, Attorney General for the State of California, Alfredo Terrazas, Senior Assistant Attorney General, Wilbert E. Bennett Supervising Deputy Attorney General, Oakland, California, were on the brief.

---

**ORDER**

Appellants' motion for clarification is GRANTED.

The opinion filed in this case on September 16, 2008, slip op. at 12915, is amended as follows:

At slip op. at 12942, second to last paragraph, lines 4-5: Delete "and shall enjoin the Board from denying him a Branch II license to engage in his chosen profession".

The petition for rehearing and rehearing en banc remains pending. Subsequent petitions for rehearing will be entertained.

---

**OPINION**

O'SCANNLAIN, Circuit Judge:

We must decide whether a state regulatory scheme violates the equal protection rights of pest controllers.

I

A

Alan Merrifield appeals from a grant of summary judgment denying his request for a permanent, prospective injunction of

California's structural pest control licensing requirements. He engages in "non-pesticide animal damage prevention and bird control" ("ADP & BC"), which includes installing spikes, screens, and other mechanical devices in or on buildings and other structures so as to remove vertebrate pests—e.g., skunks, raccoons, squirrels, rats, pigeons, starlings, bats—or to keep them away from structures. California law requires all persons engaged in structural pest control to obtain licenses, with certain statutory exemptions. Merrifield argues that the applicable licensing requirement is intended for pesticide-based pest control, and that he should be exempt from such requirement because he does not use pesticides.[1]

Persons who engage in structural pest control without a license in California face misdemeanor convictions punishable by fines of up to $1,000 and six months imprisonment per violation.[2] Cal. Bus. & Prof. Code ("Code") § 8553. The state Structural Pest Control Board ("Board") enforces the licensing requirements. The record includes correspondence between Merrifield and Board officials making clear that his bids for a government project to birdproof the Trans Bay Ter-

---

[1]Appellants also include Urban Wildlife Management ("UWM"), a company that Merrifield owns, and the California Nuisance Wildlife Control Operators Association ("CNWCOA"), a trade group of businesses that are "engaged in the nonpesticide removal or exclusion of vertebrate pests." Merrifield has standing because he cannot engage in his trade unless he first satisfies the current licensing requirement or receives an exemption. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). The CNWCOA also has standing because its members suffer the same injuries. *See Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 342-43 (1977). UWM does not have standing to bring a privileges and immunities claim because it is a corporation. *See W. Turf Ass'n v. Greenberg*, 204 U.S. 359, 363 (1907) ("[A] corporation cannot be deemed a citizen within the meaning of the clause of the Constitution of the United States which protects the privileges and immunities of citizens of the United States . . . ."). For convenience, this opinion refers to the plaintiffs-appellants as "Merrifield."

[2]Submitting a bid to a public agency without a license qualifies as such misdemeanor. Cal. Bus. & Prof. Code § 7028.15(a).

minal in San Francisco would not be considered unless he had a "Branch II" license. On February 21, 1997, the Board warned Merrifield to comply with the licensing statute. After quoting the text of the licensing requirement, the letter stated:

> It has come to the Board's attention that you do not posses [sic] the proper Branch II (General Pest Control) License or Company Registration Certificate issued by the Board. It is also apparent that you are advertising and conducting Rodent Proofing (rats, mice, etc.) activities.
>
> If you or your firm is conducting any pest control activity or advertisement which requires a Branch II License or Company Registration Certificate, you are ordered to cease and desist all activity unless properly licensed or are [sic] in compliance with Section 8555(g) Business and Professions Code.
>
> This notice will be your only warning that any firm or person which violates the provisions of the Structural Pest Control Act will be investigated and appropriate legal action will be initiated through the District Attorney's Office. Compliance with these requirements . . . shall be mandatory by March 31, 1997.
>
> If you are interested in becoming licensed in Branch II, please contact the Board's Licensing or Enforcement Division . . . .

Merrifield has never applied for such a license and claims none is necessary for his business activity.

B

Since 1941, California has provided that the Board will regulate those engaged in the business of "structural pest con-

trol." Cal. Bus. & Prof. Code § 8520. The Board's "primary mission," according to Code section 8520, is "consumer protection." *Id.* The State forbids "any individual to engage or offer to engage in the business or practice of structural pest control . . . unless he or she is licensed" in conformity with state law and the Board's requirements. *Id.* § 8550(a). The applicable statute sets forth a tri-partite licensing scheme: Branch I for fumigation, Branch II for general pest control,[3] and Branch III for termite control. *Id.* § 8560.

Under the 1941 Code, both pesticide-based and non-pesticide-based pest control operators were required to obtain a Branch II license because the term "structural pest control" was defined to include:

> identification of infestations or infections; the making of an inspection or inspections for the purpose of identifying or attempting to identify infestations or infections of household or other structures by such pests or organisms; the making of inspection reports, recommendations, estimates, and bids, whether oral or written, with respect to such infestations or infections; and the making of contracts, or the submitting of bids for, or the performance of any work including the making of structural repairs or replacements, or the use of insecticides, pesticides, rodenticides, fumigants, or allied chemicals or substances, or *mechanical devices for the purpose of eliminating, exterminating, controlling or preventing infestations or infections of such pests, or organisms*.

*Id.* § 8505 (emphasis added).[4]

---

[3]"General pest" control is defined as "[t]he practice relating to the control of household pests, excluding fumigation with poisonous or lethal gases." Cal. Bus. & Prof. Code § 8560(a).

[4]The Code uses the term "structural pests" to encompass "household pests and wood destroying pests or organisms, or such other pests which may invade households or other structures, including railroad cars, ships, docks, trucks, airplanes, or the contents thereof." Cal. Bus. & Prof. Code § 8560(a).

In 1995, the California legislature enacted an express exemption from the Branch II license requirement for "[p]ersons engaged in the live capture and removal or exclusion of vertebrate pests, bees, or wasps from a structure without the use of pesticides." *Id.* § 8555(g). The new provision limited its definition of "vertebrate pests" to ensure that persons controlling mice, rats, or pigeons would still need to obtain Branch II licenses: " 'Vertebrate pests' include, but are not limited to, bats, raccoons, skunks, and squirrels, but *do not include mice, rats, or pigeons*." *Id.* (emphasis added).

Obtaining a Branch II license requires proof that the applicant has had at least two years of "actual experience . . . or the equivalent" working in "the particular branch" for which a license is desired. *Id.* § 8562(b). Since 1993, each applicant has also been required to provide proof of a year of experience as a licensed Branch II "field representative" or "the equivalent of that training or experience." *Id.* § 8562(f). Finally, the applicant must pass the Board-administered Branch II exam with a score of 70 percent or better. *Id.* § 8560(a), (f). The sample Branch II exam and preparation materials entered in the record reveal that most subject areas "relate to the use and storage of pesticides and/or the identification and control of invertebrate pests." *Merrifield v. Lockyer*, 388 F. Supp. 2d 1051, 1054 (N.D. Cal. 2005). The district court found that "[o]f the 200 questions on the sample exam supplied, at most 18 questions relate to mice, rats, and/or nonrodenticide-based mouse or rat control," six questions related to "compliance procedures [that] are possibly applicable to all pest-control enterprises," and "[o]ne question concerns bat droppings." *Id.*

## C

Faced with the prospect of either punishment if he worked without a license or enduring much expense and effort to obtain the license, Merrifield filed this 42 U.S.C. § 1983 suit

against the Board and various other officials[5] (collectively "the Board") in the district court on February 6, 2004. The complaint alleged that the Branch II licensing requirement violates the Equal Protection, Due Process, and Privileges or Immunities Clauses of the Fourteenth Amendment, and sought declaratory and injunctive relief. The parties submitted and amended their filings, and conducted extensive civil discovery, including pages of interrogatories posed by Merrifield and responses by Board members. Several experts entered depositions and declarations, including those who testified on the effectiveness of non-pesticide pest control and on the potential rationale behind the licensing rules and the 1995 exemption therefrom.

The parties then cross-moved for summary judgment on the issue of whether the Branch II licensing requirement in section 8555(g) was rationally related to a legitimate government purpose. On August 1, 2005, the district court granted summary judgment to the State and denied summary judgment to Merrifield. *Merrifield*, 388 F. Supp. 2d at 1064-65. Merrifield timely appealed.[6]

II

Merrifield first claims that California's Branch II pest control licensing requirement violates the Privileges or Immunities Clause of the Fourteenth Amendment because it infringes on his right to practice his chosen profession. The state contends that this provision cannot be invoked by citizens against the legislative power of their own states, except with regard to the right to travel.

---

[5]The original complaint named several other state officials, including Arnold Schwarzenegger, Governor of California; Valerie Brown, California Assemblywoman; and Bill Lockyer, Attorney General of California, but these defendants were dismissed from the case.

[6]We review a district court's decision on cross-motions for summary judgment de novo. *Bader v. N. Lina Layers, Inc.*, 503 F.3d 813, 816 (9th Cir. 2007).

**[1]** The Privileges or Immunities Clause of the Fourteenth Amendment does not expressly contain a home-state restriction, for it states: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States." U.S. Const. amend. XIV, § 1, cl. 2. However, the Supreme Court drew tight boundaries around the Privileges or Immunities Clause of the Fourteenth Amendment in the *Slaughter House Cases*, 83 U.S. (16 Wall.) 36 (1872). The Court ruled that the clause only secures those rights which "own their existence to the Federal government, its National character, its Constitution, or its laws."[7] *Id.* at 79. Some examples of Federal privileges or immunities protected by the Fourteenth Amendment listed by the Supreme Court were the right to petition the Federal government and to "demand the care and protection of the Federal government over his life, liberty, and property when on the high seas." *Id.* at 79. However, the Court made it very clear that the traditional privileges and immunities of citizenship "which are, in their nature, fundamental; which belong, of right, to the citizens of all free governments," such as the right to engage in one's profession of choice, *see Corfield v. Coryell*, 6 F.Cas. 546, 551-52 (C.C.E.D. Pa. 1823), were not protected by the Privileges or Immunities Clause if they were not of a "federal" character. *Slaughter-House Cases*, 83 U.S. (16 Wall.) at 78-79.

In *Saenz v. Roe*, 526 U.S. 489 (1999), however, the Court held that "[d]espite fundamentally differing views concerning the coverage of the Privileges or Immunities Clause of the Fourteenth Amendment, most notably expressed in the majority and dissenting opinions in the *Slaughter-House Cases*, it

---

[7]With respect to the Privileges and Immunities Clause of Article IV, the *Slaughter-House* Court concluded that "[i]ts sole purpose was to declare to the several States, that whatever those rights, as you grant or establish them to your own citizens, or as you limit or qualify, or impose restrictions on their exercise, the same, neither more nor less, shall be the measure of the rights of citizens of other States within your jurisdiction." *Slaughter-House Cases*, 83 U.S. (16 Wall.) 36, 77 (1872).

has always been common ground that this Clause protects the third component of the right to travel." *Id.* at 503 (citation omitted). According to the Court, the third component of the constitutional right to travel protects, "for those travelers who elect to become permanent residents [of a State], the right to be treated like other citizens of that State." *Id.* at 500. The Court thus reopened a debate that many had considered foreclosed by the *Slaughter-House Cases.*

Merrifield argues that the right to pursue one's chosen profession now falls within the purview of the clause arguing that the *Slaughter-House* Court's holding that the right to earn a living in a common occupation was not among the rights of national citizenship has since been repudiated. It is true that the Court has recognized a federal right to pursue one's chosen profession under substantive due process. *Conn v. Gabbert*, 526 U.S. 286, 291-92 (1999); *Schware v. Bd. of Bar Exam'rs of N.M.*, 353 U.S. 232, 238-39 (1957). However, *Saenz* represents the Court's only decision qualifying the bar on Privileges or Immunities claims against "the power of the State governments over the rights of [their] own citizens." *Slaughter-House Cases*, 83 U.S. (16 Wall.) at 77. That case was limited to the right to travel. The Court has not found other economic rights protected by that clause, although many scholars have argued for overruling the *Slaughter-House Cases* in toto.[8]

**[2]** Given the *Slaughter-House Cases* limitation on the Privileges or Immunities Clause of the Fourteenth Amendment, we cannot grant relief based upon that clause unless the

---

[8]Akhil Reed Amar, *Substance and Method in the Year 2000*, 28 Pepp. L. Rev. 601, 631 n.178 (2001) ("Virtually no serious modern scholar-left, right, and center-thinks that this [*Slaughter-House Cases*] is a plausible reading of the [Fourteenth] Amendment."); Douglas W. Kmiec, *"God's Litigator"*, 70 Notre Dame L. Rev. 1247, 1253 n.29 (1995) (reviewing William Bentley Ball, *Mere Creatures of the State? Education, Religion, and the Courts: A View From the Courtroom* (1994)).

claim depends on the right to travel. Merrifield's claim does not invoke that right, and therefore must be denied.

### III

**[3]** Merrifield next claims that California's Branch II pest control licensing requirement violates the Due Process and Equal Protection Clauses of the Fourteenth Amendment. All parties agree that rational basis review applies.[9]

### A

Merrifield relies heavily on two recent cases, which struck down regulatory schemes, to establish both his due process and equal protection claims: *Cornwell v. Hamilton*, 80 F. Supp. 2d 1101 (S.D. Cal. 1999) and *Craigmiles v. Giles*, 312 F.3d 220 (6th Cir. 2002).

### 1

*Cornwell* involved an "African hair braider" who engaged in "natural hair care" and asserted that she should be permitted to braid hair without fulfilling California's cosmetology licensing requirement. 80 F. Supp. 2d at 1102, 1104-05. The district court agreed, because Cornwell could not "reasonably be classified as a cosmetologist as it is defined and regulated presently," and "[e]ven if [she] were defined to be a cosmetologist, the licensing regimen would be irrational as applied to her because of her limited range of activities," which overlapped only minimally with the types of activities covered in the state's principal training curriculum and examination. *See id.* at 1108, 1110, 1115 (finding "well below ten percent" of the curriculum to be relevant to Cornwell's actual activities and 11 percent of exam questions to be relevant to Cornwell's

---

[9]Under rational basis review, a statute will pass constitutional muster if it is "rationally related to a legitimate state interest." *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976).

actual activities). The court viewed this marginal overlap as constitutionally infirm due to overbreadth (by including persons to whom the license was not relevant) and underinclusiveness (by failing to ensure the competency of hair braiders). The court found the only imaginable justification to be economic protectionism of the cosmetology industry, which it deemed illegitimate. *Id.* at 1117-18 & n.50. Thus, the licensing requirement violated Cornwell's due process and equal protection rights.

In *Cornwell*, the district court observed that under the Equal Protection Clause " 'sometimes the grossest discrimination can lie in treating things that are different as though they were exactly alike.' " *Id.* at 1103 & n.2 (quoting *Jenness v. Fortson*, 403 U.S. 431, 442 (1971)). In *Jenness*, however, the Supreme Court used the phrase in response to an argument that a Georgia state election law that treated traditional political parties differently than newer parties for ballot qualification violated equal protection. *Jenness*, 403 U.S. at 441-42. The Court noted that it was rational for Georgia to treat the two types of political organizations differently based on the different challenges that each entity faces and Georgia's need properly to manage elections. *Id.* The Court cited *Williams v. Rhodes*, 393 U.S. 23 (1968), in which it struck down an Ohio ballot access law due to its *different* treatment of established and new political parties. In other words, in both *Jenness* and in *Williams*, the challenged laws imposed *different* requirements on two different groups, traditional and new political parties. However, in *Cornwell* the challenge was by an African hair stylist who challenged a *uniform* licensing scheme. While the reasoning of the district court in *Cornwell* may be consistent with our due process analysis, it cannot survive equal protection analysis.

2

In *Craigmiles*, the Sixth Circuit affirmed the decision of a district court, following a bench trial, that the inclusion of cas-

ket merchants within the licensing requirement for funeral
directors violated equal protection and due process. 312 F.3d
at 222. The court cited the district court's findings that requir-
ing casket sellers to learn the skills of funeral directors did not
further health and safety, because casket sellers did not
engage in funeral activities, such as cleaning and embalming
corpses. The court did discern one possible reason for regulat-
ing casket merchants: "The quality of the caskets used poten-
tially threatens public health." *Id.* at 225 (emphasis omitted).
However, the court rejected this rationale for lack of a rela-
tionship to the licensing requirement, which ensured that "the
only difference between the caskets [sold by licensed and
unlicensed persons] is that those sold by licensed funeral
directors were systematically more expensive." *Id.* at 225-26.
The court also rejected the government's argument that the
licensing law helped ensure that persons selling caskets knew
how to respond to customers' grief (such matters were tested
on the exam). *Id.* at 228. Having rejected all possible reasons
the government provided or that the court could reasonably
conceive, it concluded that the licensing law imposed a bur-
den upon casket merchants merely "to prevent economic com-
petition" with funeral directors. *Id.* at 225. As such, the law
failed rational basis review.

The casket retailers in *Craigmiles* argued that their business
was so *different* from funeral directors that the government's
interest in public health and safety in regulating funeral direc-
tors was not implicated. *Id.* In other words, although the cas-
ket sellers brought claims under both the Due Process and
Equal Protection Clauses, and the Sixth Circuit affirmed on
both grounds, their argument was not that they were being
treated differently in violation of the Equal Protection Clause,
but that they were suffering an unconstitutional barrier to
practice their profession— a due process claim.[10]

---

[10]The cases cited by *Craigmiles* highlight that an equal protection analy-
sis was not really applicable. *City of Cleburne v. Cleburne Living Ctr.*, 473
U.S. 432 (1985) struck down a law preventing a group home that serviced
the mentally disabled from operating under a zoning law which expressly
classified "the feeble-minded" *differently* from other groups. *Craigmiles*,
312 F.3d at 227.

3

The plaintiffs in *Cornwell* and *Craigmiles* were treated the same as other groups under the challenged statutory framework. Therefore, the equal protection analytical framework requiring a rational connection between a legitimate interest and different classifications was inapplicable to these cases. *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) ("The Equal Protection Clause does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike.").

Because *Craigmiles* and *Cornwell* involved plaintiffs arguing that they were *different* from other groups and should not be treated the *same*, these cases are not directly applicable to Merrifield's claim that he is the *same* as other non-pesticide exterminators and is being treated *differently*.[11] However, the cases are analogous and applicable to Merrifield's due process claim that he is *different* from pesticide-using exterminators and should not be treated the *same* as them, because such treatment is an unconstitutional barrier on his liberty under the Due Process Clause.

B

1

**[4]** Merrifield argues that the licensing requirement for non-pesticide pest controllers bears no relationship to any legitimate interest such as public health, safety, or consumer protection. With respect to Merrifield's due process claim, the first aspect of the rational basis test is easily satisfied by the

---

[11]Although not directly applicable, *Craigmiles* does have a helpful discussion regarding how, in either a due process or an equal protection analysis, the history of the legislation in question may affect whether a government's action may survive rational basis scrutiny. The relevance of this portion of *Craigmiles* is discussed below in Part III.C.

government's interests in public health and safety and consumer protection. *See Watson v. Maryland*, 218 U.S. 173, 177 (1910) ("It is too well settled to require discussion at this day that the police power of the states extends to the regulation of certain trades and callings, particularly those which closely concern the public health."); *cf. Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 189-90 (1997) (finding consumer protection to be a legitimate federal governmental interest). However, if the statute is *unrelated* to these interests, the statute lacks a rational basis.

## 2

The Branch II licensing statute includes three requirements: 1) at least two years of "actual experience . . . or the equivalent" working in "the particular branch" for which a license is desired, Cal. Bus. & Prof. Code § 8562(b); 2) a year of experience as a licensed Branch II "field representative," *id.* § 8562(f); and 3) passage of the Board-created Branch II exam with a score of 70 percent or better, *id.* § 8560(a), (f). Merrifield asserts that these requirements have no legitimate purpose for persons engaged in structural pest control without pesticides, and simply inhibit competition in the marketplace. We now turn to the individual Branch II license requirements in light of Merrifield's due process challenge.

## i

**[5]** Merrifield does not offer any significant argument challenging the validity of the training requirements. Nor would that be possible. "A State can require high standards of qualification, such as good moral character or proficiency . . . before it admits an applicant . . . , but any qualification must have a rational connection with the applicant's fitness or capacity to practice [the profession]." *Schware v. Bd. of Bar Exam'rs*, 353 U.S. 232, 239 (1957) (discussing state requirements to practice law). The training requirement in section 8562(b) ensures that structural pest controllers have perspec-

tive, judgment, and skills related to their occupation. Although Merrifield asserts that the pesticide license examination *and training requirements* are almost entirely geared toward establishing an applicant's expertise with regard to pesticides and invertebrates, the training requirements do *not* require persons to work with pesticides or invertebrates. Merrifield offers no evidence that the state has rejected a person's training because it involved non-pesticide work.[12] The second requirement, section 8562(f), requires a year of work as a Branch II "field representative." Again, this provision does not specify that the work must be with pesticides. Therefore, the licensing scheme does not inflict the same burden as the scheme in *Cornwell*, which required a hair braider to engage in business activities that she otherwise would not have engaged in during the course of her business to get the license. *Cornwell*, 80 F. Supp. 2d at 1108, 1110, 1115.

**[6]** Additionally, unlike the plaintiffs in *Cornwell* and *Craigmiles*, Merrifield offers no reason to believe that training would not increase the safety of his profession. As the government points out, the work of non-pesticide pest controllers is not without risk of harm. Like other structural pest controllers, Merrifield must climb on people's roofs to install his pigeon wires and apparatuses; he must enter businesses and homes; he must deal with pests that can spread disease. Proper training and oversight would help him to obtain the requisite skills and competency. Thus, Merrifield's suggestion that the training requirements serve no purpose must be rejected.

ii

**[7]** Merrifield's challenge to the third requirement, a 70 percent score on the licensing examination, requires careful

---

[12]Merrifield does not aver that *all* current Branch II licensees work with pesticides, which would leave applicants no option but to work with pesticides.

analysis. Merrifield asserts that the examination requirement exceeds its purpose because the test simply focuses on pesticide-handling. He relies heavily on the rationale of *Cornwell*, which rested much of its analysis on the lack of relevant hair braiding questions on the cosmetology exam. He cites to the pesticide-centric questions on the licensing examination and objects that the test has no relevance for persons who do not use pesticides. To substantiate this point, Merrifield submits a sample licensing examination, in which he asserts "[o]ne hundred and eighty-four of the 200 questions on the test are entirely irrelevant to what [he] does." In further support of his claim, he points to the licensing exemption in section 8555(g), which, he believes, belies the government's contention that the Branch II requirement is necessary for non-pesticide pest control.

Merrifield also contends that the licensing scheme fails to achieve its purpose by being too narrow: "A test that is focused on the use, storage, and disposal of chemical poisons, and which *contains no questions about pigeons or non-pesticide pest control techniques*, cannot fairly evaluate an applicant's fitness or capacity to install screens and pigeon spikes" (emphasis added). If the licensing requirement were aimed at public health and safety and consumer protection, he argues, the requirements would have included provisions regarding non-pesticide techniques as well.

The government responds that "[l]icensure ensures that structural pest control operators are educated about potential health threats caused by vertebrate pests, including mice, rats, and pigeons." By requiring structural pest controllers to obtain licenses, the state creates a framework to monitor them and keep them accountable. Furthermore, requiring persons who do not use pesticides to learn about the risks of pesticides is rationally related to the government's interest in public safety because persons like Merrifield work in environments where they may be exposed to pesticides that have been applied previously and left on-site. Finally, the government

contends that structural pest controllers should be educated on the various consumer options with respect to pest control, so that they can advise their customers on the relative effectiveness and flaws of different control techniques. The government offers no evidence that pigeons have been covered in prior examinations, but points out several aspects of the examination covering skills and knowledge relevant to all persons engaged in structural pest control.

**[8]** The merits of the government's contentions are best understood by reference to the sample examination itself. With respect to the exam, a significant number of the questions on the examination are very relevant for persons like Merrifield. Other questions on the examination address invertebrate pests, or vertebrate pests that are not mice, rats, or pigeons. But those questions are equally "irrelevant" to *pesticide-based* pest controllers who specialize in targeting mice, rats, and pigeons. The licensing statute does not fail because it is not tailored to each precise specialization within a field. "It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it." *Williamson v. Lee Optical*, 348 U.S. 483, 488 (1955).

Finally, many more questions do relate directly to Merrifield's line of work. For example, 12 questions discuss rats and mice. Some other questions test the applicant's ability to recognize what pest is responsible for an infestation by describing signs and asking the applicant which animal would leave such marks. These questions are relevant. Even if the answer is not "mice," "rats," or "pigeons," a person specializing in mice, rats, or pigeons should be able to recognize what traces such pests would *not* leave. In this way, many questions that Merrifield discounts as irrelevant, perhaps based on the fact that their correct answers are not "mice," "rats," or "pigeons," in fact test knowledge relevant to all structural pest control.

Furthermore, several questions address legal requirements that apply to all persons engaged in structural pest control and have no relation to the risks of pesticides or to any particular animal.

**[9]** Having reviewed the examination questions, we conclude that Merrifield's claims understate their relationship to his line of work. All three licensing requirements have a connection to competence in the field, and therefore satisfy rational basis review. In other words, unlike in *Craigmiles*, California has a legitimate public health interest in requiring *all* structural pest controllers to obtain licenses. Therefore, Merrifield's challenge to the rationality of the licensing requirement under due process must be rejected.

### C

**[10]** Finally, Merrifield argues that the classification within the statutory exemption has no rational basis and thus violates equal protection. Section 8555(g) discriminates between non-pesticide pest controllers of vertebrate animals such as "bats, raccoons, skunks, and squirrels," and non-pesticide pest controllers of "mice, rats, or pigeons." Only the former are exempt from the licensing requirement. Merrifield argues that this distinction, based upon the type of pest controlled, is irrational.

### 1

**[11]** Under rational basis review, Merrifield's claim must be rejected as long as "there is any reasonably conceivable state of facts that could provide a rational basis" for the challenged law. *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993). The government is not required to substantiate its reasoning with facts. "In an equal protection case of this type . . . those challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not *reasonably* be conceived to be true

by the governmental decisionmaker." *Vance v. Bradley*, 440
U.S. 93, 111 (1979) (emphasis added). "The State is not com-
pelled to verify *logical* assumptions with statistical evidence."
*Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 812 (1976)
(emphasis added).

The Supreme Court has stated that "[l]egislatures may
implement their program step by step, in . . . economic areas,
adopting regulations that only partially ameliorate a perceived
evil and deferring complete elimination of the evil to future
regulations." *City of New Orleans v. Dukes*, 427 U.S. 297,
303 (1976) (internal citation omitted). "States are accorded
wide latitude in the regulation of their local economies under
their police powers, and rational distinctions may be made
with *substantially less than mathematical exactitude*." *Id.*
(emphasis added). Indeed, we must remember that "the judi-
ciary may not sit as a superlegislature to judge the wisdom or
desirability of legislative policy determinations made in areas
that neither affect fundamental rights nor proceed along sus-
pect lines." *Id.*

In *Dukes*, the Supreme Court upheld an ordinance which
exempted pushcart owners who had been selling food for at
least 8 years from a general prohibition on pushcarts in the
French Quarter. *Id.* at 298-99. The Court determined that the
city had a legitimate interest in maintaining the charm of the
French Quarter and that limiting the number of pushcart ped-
dlers by only allowing those who were older, was rationally
related to that interest because the French Quarter's older ped-
dlers were part of the charm and had more of an established
interest than newer ones. *Id.* at 304-05.

The Sixth Circuit's equal protection analysis in *Craigmiles*
is also instructive. The court considered the history of the leg-
islation and held that the state had "specifically amend[ed]"
the legislation to include casket retailers. 312 F.3d at 227. The
court determined that this fact, the singling out of a particular
economic group, with no rational or logical reason for doing

so, was strong evidence of an economic animus with no relation to public health, morals or safety. Therefore, the court concluded that the funeral director licensing scheme which required casket sellers to obtain a license was unconstitutional for failure to survive rational basis scrutiny. *Id.* at 227-29.

2

Here, the record reveals at least one conceivable purpose, which the government's expert, Eric Paulsen, discussed in his testimony. Paulsen worked for the Pest Control Operators of California ("PCOC") from 1991 to 1997, for Mission City Fumigation and California Heat from December 1997 to September 1998, and again for PCOC from September 1998 onward. These jobs gave him insights into the legislative history of section 8555(g), because he represented the PCOC at meetings with legislators and Board members involved in reforming the licensing requirements.[13] Paulsen explained that the California legislature decided to change its structural pest licensing requirements after Assemblywoman Valerie Brown received complaints from constituents who wanted to exterminate pests with "homemade concoctions" that fell within the Branch II requirements but were not purchased as pesti-

---

[13]Contrary to Merrifield's suggestions, Paulsen did not express the viewpoint of the government. Merrifield asked the district court to strike much of Paulsen's testimony on the grounds that Paulsen was not an expert on the matters in question—a point the district court rejected due to "Paulsen's more than twenty years of experience in the field of structural pest control." *Merrifield v. Lockyer*, 388 F. Supp. 2d 1051, 1063 (N.D. Cal. 2005). Paulsen certainly had the ability to testify to his personal experiences with the legislature. However, the *actual* purpose of the legislature did not matter for rational basis review. *See FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993). Thus the district court held Paulsen's statements about the legislative history to be "irrelevant to the extent they relate to the *actual* purposes and motivations of the [Board] and its members," but "since the Court did not consider the statements for *this purpose*, the Court declines to sustain [Merrifield's] objections to the statements in this regard." *Merrifield*, 388 F. Supp. 2d at 1064 (emphasis added).

cides. They sought "to have their own license that dealt with their specialty." However, Paulsen explained, the legislature did not want to create "additional licensing categories" and thus the question became whether to exempt persons who did not use "dangerous pesticides."[14] Paulsen explained that the PCOC opposed any licensing exemption, including with respect to pigeons. "[O]ur position as the Pest Control Operators of California and my understanding [of] the Structural Pest Control Board's position was that the trapping and exclusion of any of these birds [pigeons] really should [require] a structural pest control license." When asked about a limited exemption based on the type of animal targeted, Paulsen asserted that such a compromise, would "from the lay person's perspective . . . be irrational."

Merrifield argues that Paulsen's testimony should be read to mean that any *retention* of the licensing requirement was irrational. The text belies that assertion—Paulsen thought the *removal* of the requirement could be viewed as irrational in the sense that the exempted activities *also* posed health risks. However, Paulsen explained at length that the compromise could be justified on the grounds that mice, rats, and pigeons are the most common structural pests, and in particular "[p]igeons are the primary bird which is attacking structures." He also posited that the impact of non-pesticide based control of such pests would be relatively greater insofar as non-pesticide techniques would be the most common.

Indeed, Merrifield's experts did not dispute the rationality of maintaining a licensing requirement for persons engaged in structural pest control without pesticides. Instead, they argued that a *separate* category would be better, because "[t]he field covered by the Branch [II] category is simply too large to be covered by one examination." The record itself reveals that,

---

[14]The record corroborates Paulsen's testimony regarding the impetus for the bill.

as initially proposed, the legislation would have created a separate licensing category.

3

**[12]** Generally, the legislature's decision to remove certain licensing requirements that it no longer deems essential, rather than create a new licensing category, is a rational and quintessentially legislative decision. Despite the reasons given by the government for the exemption, it does not logically follow from the legislative assumptions that removing the licensing requirement for non-pesticide control of less common pests—especially those more commonly and effectively controlled by *pesticides*—would pose a lesser risk to public welfare. Indeed, those engaging in the non-pesticide control of less common pests are more likely to encounter prior pesticide use or are more likely to recommend that their clients use pesticides rather than their services. In other words, those exempted under the current scheme are more likely to be exposed to pesticides than individuals like Merrifield.

The possibility that non-pesticide-using pest controllers might interact with pesticides or will need the skill to suggest pesticide use when it would be more effective is the very rationale that government's counsel proffered, and we relied upon, in upholding the requirement that Merrifield obtain a license under due process grounds. We cannot simultaneously uphold the licensing requirement under due process based on one rationale and then uphold Merrifield's exclusion from the exemption based on a completely contradictory rationale. Needless to say, while a government need not provide a perfectly logically solution to regulatory problems, it cannot hope to survive *rational* basis review by resorting to irrationality.

**[13]** This case is deceptively similar to *Dukes*, where the plaintiffs were prohibited from engaging in the same push-carting business that others were allowed to engage in. Here,

Merrifield is engaged in the non-pesticide extermination of pests and those who are exempt from the licensing requirement also engage in the same business. In *Dukes*, the City of New Orleans drew a classification line based on when a person began his or her pushcart business. Here, the line drawn by the State is based on what kinds of pests the business exterminates.

However, unlike in *Dukes*, there is not a legitimate interest implicated by the classification. The Supreme Court in *Dukes* held that the City of New Orleans was legitimately concerned with maintaining the charm and beauty of the French Quarter and the limitation of pushcarts was rationally related to furthering that interest. Here, structural pest control implicates a state's health and public safety interest. The Court in *Dukes* found that the line drawn was a rational way to balance the city's interest in preserving the French Quarter with the established interest of older pushcart owners and the fact that some pushcarts actually contributed to the French Quarter's charm. Here, however, when applying the state's own rationale for requiring pest controllers such as Merrifield to take the licensing exam, the exemption scheme cannot be said to rest on a rational basis. Therefore, we conclude that *Dukes* does not require us to uphold the exemption scheme in this case.

Moreover, just as in *Craigmiles*, the licensing scheme in this case specifically singles out pest controllers like Merrifield in the exemption legislation. Needless to say, this type of singling out, in connection with a rationale so weak that it undercuts the principle of non-contradiction, fails to meet the relatively easy standard of rational basis review. Indeed, the record highlights that the irrational singling out of three types of vertebrate pests from all other vertebrate animals was designed to favor economically certain constituents at the expense of others similarly situated, such as Merrifield.[15]

---

[15]We conclude that mere economic protectionism for the sake of economic protectionism is irrational with respect to determining if a classifi-

Although economic rights are at stake, we are not basing our decision today on our personal approach to economics, but on the Equal Protection Clause's requirement that similarly situated persons must be treated equally. The *Craigmiles* court said it best:

> Our decision today is not a return to *Lochner*, by which this court would elevate its economic theory over that of legislative bodies. *See Lochner v. New York*, 198 U.S. 45 (1905). No sophisticated economic analysis is required to see the pretextual nature of the state's proffered explanations for the [ . . . ] amendment. We are not imposing our view of a well-functioning market on the people of [this state]. Instead, we invalidate only the [decisionmaking body]'s naked attempt to raise a fortress protecting [one subsection of an industry at the expense of another similarly situated] . . . .

312 F.3d at 229.

**[14]** Here, the government has undercut its own rational basis for the licensing scheme by excluding Merrifield from the exemption. The exemption from the license is given to those non-pesticide pest controllers who are most likely to interact with pesticides. Additionally, the non-pesticide pest controllers who are least likely to interact with pesticides must remain part of the licensing scheme. Therefore, the exemption scheme is not supported by a rational basis review.

---

cation survives rational basis review. In doing so, we agree with the Sixth Circuit in *Craigmiles* and reject the Tenth Circuit's reasoning in *Powers v. Harris*, 379 F.3d 1208, 1218-19 (10th Cir. 2004). *Powers* rejected the Sixth Circuit's conclusion that economic protectionism for its own sake is irrational. *Id.* We do not disagree that there might be instances when economic protectionism might be related to a legitimate governmental interest and survive rational basis review. However, economic protectionism for its own sake, regardless of its relation to the common good, cannot be said to be in furtherance of a legitimate governmental interest.

**[15]** We conclude that the section 8555(g) license exemption to the extent it does "not include mice, rats, or pigeons" is unconstitutional.

## IV

For the foregoing reasons, summary judgment in favor of the State on the exemption issue is reversed. The district court, on remand, shall enter a judgment in favor of Merrifield.

**AFFIRMED in part & REVERSED in part and REMANDED.** Costs are to be awarded to Appellant.

---

HAWKINS, Circuit Judge, concurring in part and dissenting in part:

I certainly agree with the majority's carefully thought out determination that California is entitled to require testing for pesticide knowledge of rodent and pest control operators who employ non-pesticide methods. Like the district court, however, I think it rationally follows from this that the state may determine which type of service providers should face a testing or licensing requirement and which should not. *See, e.g.*, *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976) (legislatures may adopt regulations that "only partially ameliorate a perceived evil"). I would affirm across the board.